**Virgil R. WEAVER, Neiman Sawmills, Inc. and James S. Neiman, Appellants (Defendants),**

v.

**Preston MITCHELL and Marilynn Mitchell, husband and wife, Appellees (Plaintiffs).**

**Preston MITCHELL and Marilynn Mitchell, husband and wife, Appellants (Plaintiffs),**

v.

**Virgil R. WEAVER, Neiman Sawmills, Inc. and James S. Neiman, Appellees (Defendants).**

**Nos. 84–194, 84–195.**

Supreme Court of Wyoming.

March 18, 1986 *.

* Reassigned to BROWN, J., December 23, 1985.

Tom C. Toner, Sheridan, and David F. Palmerlee, Buffalo, for appellants in case No. 84–194 and appellees in case No. 84–195.

R. Douglas Dumbrill of Hughes & Dumbrill, Sundance, for appellants in case No. 84–195 and appellees in case No. 84–194.

Before THOMAS, C.J., and BROWN, CARDINE, ROSE (Retired) and ROONEY (Retired), JJ.

BROWN, Justice.

Preston Mitchell suffered personal injuries when struck by a protruding log which had been dislodged from a load of logs being hauled by Virgil R. Weaver. A jury by general verdict awarded Mitchell an amount that apparently covered loss of earnings, pain and suffering, and medical expenses. He was also awarded punitive damages and costs. Marilynn Mitchell, wife of Preston Mitchell, received an award for loss of consortium.

We will affirm in part and reverse in part, and remand the case to the trial court for further proceedings.

In case No. 84–194, we have reworded and simplified the issues raised by appellants Virgil R. Weaver, Neiman Sawmills, Inc., and James S. Neiman as follows:

I

Was the jury adequately instructed on

1) Defendant's theory of standards of care, and

2) duty to mitigate damages.

II

Was the foundation for an economist's testimony sufficient?

III

Was the foundation for medical expenses sufficient?

IV

Was it reversible error to refuse to instruct the jury to reduce damages awarded for loss of future earnings to present value?

V

Is a wife entitled to recover for loss of consortium, and, if so, should her recovery for loss of consortium be reduced by the percentage of fault attributed to the husband?

VI

Was the award for punitive damages proper?

VII

Were the costs awarded appellees proper?

In case No. 84–195 Preston and Marilynn Mitchell cross appeal and raise a single issue as follows:

"Should the district court restrict Preston and Marilynn Mitchell's recovery of costs to amounts, which by design, undercompensate them for legitimate expenses of litigation?"

Preston Mitchell was employed by Preston Mitchell Logging Company, as a log skidder.[1] On June 29, 1982, Mr. Mitchell parked his pickup truck on a narrow, single-lane dirt and gravel road, not pulling entirely off the road. He crossed the road to talk to three log skidders employed by another sawmill. After visiting with the three men, Mitchell returned to his pickup and climbed in the back to get a tool from the toolbox. At this time a logging truck driven by Virgil Weaver was coming down the road toward Mitchell's parked vehicle. The Weaver truck was hauling logs between twelve and forty-five feet long. The logs were secured by a single cable overbind, wrapped around the logs about eight feet from the front of the load. One of the logs on top of the load had become displaced. The front of the log was held in the cable overbind while the other end of the log had swung out at an angle to the right side of the log truck. Mitchell's parked vehicle was in the path of the dislodged log. People in the area saw that the protruding log on the Weaver truck was on a collision course with Mitchell, who was standing in the back of his pickup. These people tried to warn Weaver by shouting and waving their arms. Weaver thought they were greeting him and waved back. As Weaver drove past Mitchell's vehicle, the protruding log struck Mitchell, causing the injury giving rise to this lawsuit. It was then that Weaver saw the protruding log in his right-hand mirror for the first time.

Neiman Sawmills, Inc., is Weaver's employer, and James S. Neiman is President of Neiman Sawmills, Inc. Preston Mitchell filed an action against Virgil R. Weaver, Neiman Sawmills, Inc., and James S. Neiman, asking for special, general and punitive damages. Marilynn Mitchell's claim was for loss of consortium.

The case was tried to a jury the last week in May, 1984. The jury returned a general verdict in favor of Preston and Marilynn Mitchell and apportioned fault as follows: Forty percent to Virgil R. Weaver, fifty percent to James S. Neiman and ten percent to Preston Mitchell. The jury found damages to be: Preston Mitchell, $151,840 and Marilynn Mitchell, $37,960. Punitive damages were also assessed against Virgil R. Weaver in the sum of $50 and against James S. Neiman for $75,000.

I

Appellants complain that the trial court refused to give two special instructions regarding parked vehicles. The essence of one proposed instruction was that a proper lookout for approaching vehicles should be maintained, while the second instruction stated that those who park vehicles should take measures to prevent collisions. The court's Instruction No. 2 succinctly states the basis of appellees' claim for damages and appellants' theory of defense. Instruction No. 4 is a neutral instruction in that it is applicable to the drivers and operators of both vehicles involved in this case. This instruction generally instructs on the duties of drivers and operators and specifically imposes a duty to keep a proper lookout. Instruction No. 5 specifically addresses improperly parked vehicles.

The trial court is not obligated to give instructions in the language of their proponent and may refuse proposed instructions, though correct, if the principles embodied in the requested instructions are covered

1. A log skidder operates a rubber-tired machine, places cables on trees that have been cut down, and pulls the trees to a landing from which they are loaded onto trucks.

by other instructions. *Britton v. State*, Wyo., 643 P.2d 935 (1982). The instructions given by the court adequately covered the duty to keep a proper lookout and the duty with respect to parked vehicles. In apportioning fault the jury attributed ten percent to Preston Mitchell. The jury apparently understood appellants' theory of defense, and also found some fault with Mitchell's parking and/or his lookout.

Appellants contend that it was error for the court to refuse a mitigation of damages instruction. Ordinarily, the burden of proving that damages could be mitigated is cast on the party who is at fault or who commits the wrong.[2] *Truck Terminal, Inc. v. Nielsen*, 80 Wyo. 223, 339 P.2d 413 (1959). See also, 25A C.J.S. Damages § 144(e), p. 21 (1966).

During the time appellants claim Preston Mitchell could have worked to mitigate damages, he was engaged substantially full-time in a rigorous physical therapy program to strengthen his injured leg. There was medical testimony that the exercise program was required by a doctor and was beneficial to him. This resulted in reducing damages for which appellants might otherwise have been liable. Mitchell progressively gained strength and endurance as a result of the rehabilitation program. From this appellants infer that Mitchell could have, and should have, become gainfully employed in order to minimize damages. This inference is not sufficient to overcome the direct testimony that the exercise program was required by the doctor, and that the program was substantially full-time and was, in fact, successful.

Mitchell's ability to work was only inferred, and there was no evidence that there was opportunity for him to obtain employment or that he unreasonably refused employment. Appellants failed to meet their burden of proving that Mitchell could have mitigated damages.

Appellants attempted to offer evidence that Mitchell was receiving worker's compensation benefits. Apparently, they were aware of the rule that worker's compensation benefits are not considered in mitigation of damages. 22 Am.Jur.2d Damages § 209, p. 292 (1965). Appellants contended at trial that they were not proposing this evidence for the purpose of reducing damages but to show that Mitchell had a motive for not returning to work. The trial court apparently thought this theory of admitting evidence of worker's compensation benefits received to be subterfuge and would not admit it. We agree with the trial court.

The trial court was correct in its determination that there was no evidence of Mitchell's failure to mitigate damages, and therefore, an instruction on mitigation was not proper.

II

Dr. James A. Evenson, an economist-lawyer, testified in support of Preston Mitchell's claim for economic loss. Appellants contend that the trial court erred in admitting economic testimony and charts prepared by Dr. Evenson based on assumptions of disability. They also contend that these assumptions were contrary to medical testimony, were based on wage growth assumptions unrelated to Preston Mitchell's occupation, and furthermore, were unrelated to wage earners in Wyoming.

The trial court, relying on Rules 702 and 703, Wyoming Rules of Evidence, permitted the economist to testify as an expert on economic loss. These rules provide:

> "Rule 702. Testimony by experts.
>
> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

2. An exception to this general rule is when a wronged party has, within his peculiar knowledge, facts, information or materials not readily available to the party at fault. In these circumstances the wronged party is obligated to show that damages could not be mitigated. *Rapidol Co. v. Howe Co.*, 144 Wash. 543, 258 P. 469 (1927).

"Rule 703. Basis of opinion testimony by experts.

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Appellants complain that exhibits demonstrating economic loss were admitted without foundation and were speculative. They also complain that the exhibits and the economist's testimony reflect a national wage growth rate rather than a local growth rate. A further complaint is that appellants were not permitted to conduct voir dire of the economist to establish that his conclusions as shown on the demonstration charts were without foundation and were speculative.

Charts were introduced into evidence showing the method employed by the economist in determining the probable economic loss suffered by Preston Mitchell. One chart showed economic losses based on the assumption that Mitchell would be able to return to work as a logger, but with a reduction in capacity of twenty percent. This assumption resulted in a projected lost earning capacity of $156,794. A second chart showed economic losses based on the assumption that Mitchell would never be able to return to logging and would have to work as a mechanic in the future. This assumption resulted in a projected lost earning capacity of $269,236.

In support of the first assumption, Thomas J. Gasser, M.D., an orthopedic surgeon, testified that in his opinion Mitchell would be able to work at no more than fifty percent of his previous proficiency as a logger the first year he returned to work, and that his proficiency would gradually increase to seventy to seventy-five percent. Mitchell indicated he had doubts that he would ever regain the proficiency that he had before the accident.

Dr. Gasser further testified that if Mitchell tried log skidding again and decided to give it up for medical reasons that the decision would be "medically justified." In fact, Mitchell worked as a mechanic from March to November 1983, but was laid off because his physical condition was such that it was not profitable to his employer. Still, it is arguable that plaintiffs' Exhibit 43, which assumes Mitchell would never be able to return to logging and would have to work as a mechanic, was not supported by medical evidence. However, the jury award was substantially less than the economic loss shown by this particular exhibit or the testimony in support thereof. If the exhibit was erroneously admitted, it was of no significance since the jury award was not based on this exhibit.

Appellants complain that Dr. Evenson, the economist, based his economic loss charts and testimony on the assumption that Mitchell's earnings would have increased 8.7 percent each year, the 8.7 percent figure being the average growth rate in the private sector in the entire United States. They further argue that Dr. Evenson did not provide or use wage data relevant to the lumber industry in Wyoming or Crook County, but instead, used wage data for all occupations in the United States. Appellants contend that these figures, in order to be accurate, must be limited to a particular group of employees to which Mitchell belongs (loggers), and to the locality in which he works (Wyoming or, if possible, Crook County). At trial appellants introduced Wyoming Employment Security Commission (WESC) statistics showing that the annual growth rate for loggers for the last nineteen years was five percent rather than 8.7 percent.

On cross-examination Dr. Evenson explained why the statistics suggested by appellant were not used:

"State of Wyoming statistics? Doesn't exist in the form that we need, and the answer is yes, in the past I've checked with Wyoming, all the mountain states, and going into the midwest to find the, the data that you need for these growth rates by the vector of the economy. It just doesn't exist on a state level, not in

the form we need. I know of no economist in probably 15 states that is able to utilize state data for growth rates."

Appellants attempted to have the economist make a projection of economic loss based on WESC statistics. Dr. Evenson said:

"* * * [I]f that's the way you want to perceive it. You don't have any seasonal adjustments here. In other words, your employment can go up and down. It depends on the point in time. If you want to take that and do it, you can. I don't think as an economist I can say there is a correct procedure, you see."

In any event, an 8.7 percent average growth rate suggested by appellees and a five percent average growth rate suggested by appellants were before the jury, and it was free to choose which rate it found more realistic. The verdict was general, and we cannot tell which, if either, growth rate percentage was considered by the jury. It is significant that the jury verdict was less than the projected loss of earnings suggested by Dr. Evenson.

█ We cannot say that the trial court abused its discretion in letting the testimony of Dr. Evenson stand together with the charts illustrating his testimony on projected economic loss. Neither can we say that the trial court abused its discretion in refusing to allow appellants to conduct voir dire of the economist to establish that his conclusions, as shown on the demonstration charts, were without foundation and speculative.

We recently addressed the basis of expert opinion testimony in *Thomas v. Metz*, 714 P.2d 1205 (Wyo., 1986). That case involved a medical malpractice action wherein appellant claimed it was error for physicians testifying on behalf of the defendant doctor to base their opinion in part upon his deposition. We noted that the defendant's deposition was only one of several documents relied upon by the experts. We held the trial court had discretion to allow opposing counsel to voir dire an expert witness regarding the basis of his opinion before such opinion was expressed, or wait until cross-examination:

"Ordinarily, it is within the sound discretion of the trial court whether voir dire of a witness will be allowed, or whether counsel must wait until cross-examination to attack the credibility of an expert witness. Such rulings will not be overturned on appeal absent a showing of prejudicial error. In *Reed v. Hunter*, Wyo., 663 P.2d 513, 517–518 (1983), this court stated:

"'* * * [T]he purpose of the identical counterparts in the Federal Rules of Evidence was not to provide for blanket admissibility of expert opinion testimony. The trial court remains vested with discretion in deciding whether to exclude such testimony because it is deemed unnecessary or not helpful to the trier of the factual issues in reaching an independent conclusion as to the facts. The adequacy of any foundation for such opinion testimony is subject to scrutiny through cross-examination. [Citation.] * * *'

"It should also be noted that if the credibility of an expert witness is still in question after cross-examination, counsel may then move to strike the testimony from the record." *Thomas v. Metz*, supra, at 1207–1208.

The adequacy of foundation for Dr. Evenson's opinion was tested by extensive cross-examination.

III

Appellants complain that there was no evidence indicating medical expenses incurred by Mitchell were reasonable and that because of this deficiency in proof the jury should not have been allowed to consider such expenses.

Mitchell testified without objection as to the amount of his medical expenses. Appellants moved for a directed verdict with respect to medical expenses contending, as they do on appeal, that there was no evidence of reasonableness. Appellants apparently abandoned this motion, however, because they failed to object to the court's instruction on medical expenses, or to submit an instruction that they deemed appropriate.

The court instructed the jury that "Preston Mitchell has incurred medical expenses to date of $12,891.45." Failure to object to this instruction is tantamount to stipulating to the reasonableness of medical expenses, or at a minimum, abandonment of the motion for a directed verdict as to medical expenses.

We could also affirm the trial court on this issue under the rationale of *Northwest States Utilities Co. v. Ashton,* 51 Wyo. 168, 65 P.2d 235, 242 (1937). We said:

> "* * * While it is no doubt true that the measure of what plaintiff may recover in a personal injury action is not the obligation he has incurred or the sum he has paid out for medical fees and hospitalization, but only such sum as was reasonably and necessarily incurred or paid (17 C.J. 915), nevertheless, we think under the authorities these matters may be determined by the jury from the evidence of the character of the injury and of the medical services and treatment rendered, together with the charge made therefor, especially when no objection is raised until after the taking of evidence is closed. [Citations.]"

We do not suggest that direct proof of reasonableness be neglected at trial. Here, appellees could have easily avoided the problems and hazards of this issue by utilizing Rule 36, Wyoming Rules of Civil Procedure W.R.C.P. (Requests for Admission) or producing evidence of necessity and reasonableness at trial.

## IV

Appellants requested an instruction as follows:

> "In determining the amount of damages for any loss of earnings and medical expenses which will be incurred in the future, it is the duty of the jury to ascertain and fix the present worth in dollars of such future damages.
>
> "A lump sum of money received today is worth more than the same sum paid in installments over a period of months or years because a sum received today can be invested and earn money at current interest rates. By making a reduction for the earning power of money, your answer will reflect the present value in dollars of an award of future damages."

During the testimony of Dr. Evenson, it appears that he in fact reduced the projected future loss of earnings to reflect a present value. He testified:

> "Now, once you get the annual loss of 8,686, the next thing you're faced with is what's the present value of that loss. And I'll rewrite my figures on what's called—if you, as jurors, if you determine there's a loss, that money is in today's money and it can earn interest. * * *
>
> "If you, as jurors, determine there's a loss it's less than that because you can earn interest on that. That's what's called present value.
>
> "The present value of that is 7,877.
>
> "And I'll—okay. What this means is 7,800 now invested for a year will grow to that 8,600, but that shaded area is what's called present value. That is what you need today to pay for his loss next year.
>
> * * * * * *
>
> "What you are interested in, again, are these present values. That is those little shaded areas. That's what is called the present value of the loss for the year. It's like creating a little bank account for what you need to set aside for that year of his worklife."

The expert witness reduced the projected loss of earnings to present value and explained this principle to the jury; therefore, it was not error for the trial court to refuse to give appellants' proposed instruction.

## V

The jury awarded appellee Marilynn Mitchell $37,960 for loss of consortium.[3]

3. "Consortium. Conjugal fellowship of husband and wife, and the right of each to the company, society, co-operation, affection, and aid of the other in every conjugal relation. * * 'Loss of consortium' means loss of society, affection, assistance and conjugal fellowship, and includes loss or impairment of sexual

Appellants contest the propriety of this award.

In *Bates v. Donnafield,* Wyo., 481 P.2d 347 (1971), we held that a wife may not recover for loss of consortium resulting from injuries to her husband. Our determination in that case was based on the common law which provided that although a husband had a cause of action for the loss of consortium for injuries to his wife caused by the negligence of a third party, the wife had no such cause for injuries negligently inflicted on her husband. Appellees invite us to reexamine this court's determination in *Bates v. Donnafield,* supra.

We have not hesitated to overrule cases that were based on what was perceived to be the common law at the time the decisions were handed down. *McClellan v. Tottenhoff,* Wyo., 666 P.2d 408 (1983); and *Collins v. Memorial Hospital of Sheridan County,* Wyo., 521 P.2d 1339 (1974). We are justified in overruling prior cases grounded on the common law if they stand for an unfair and improper rule or have outlived their usefulness, and do not meet changing needs.

This court has previously explained the relationship of the common law to the jurisprudence of this state.

> "The adoption of common law by Wyoming was not an adoption of a set code of law. By nature, the common law is not a set code of law. Nor was the adoption one of static and nonchanging law. The statute (§ 8-1-101, W.S.1977) by which such adoption was made reads: " 'The common law of England *as modified by judicial decisions,* so far as the same is of a general nature and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law prior to the fourth year of James the First (excepting the second section of the sixth chapter of forty-third Elizabeth and ninth chapter of thirty-seventh Henry Eighth) and which are of a general nature and not local to England, are the rule of decision in this state when not inconsistent with the laws thereof, and are considered as of full force until repealed by legislative authority.' (Emphasis supplied.)" *Choman v. Epperley,* Wyo., 592 P.2d 714, 716 (1979).
>
> "* * * Our statute (Sec. 26-101) [now § 8-1-101, W.S.1977 (Aug. 1978 Replacement)] does not state what are the judicial decisions to which reference is made. However, it is, and has been, the constant practice of courts in common law jurisdictions to freely cite cases from other common-law courts, and we take it that the legislature had in mind the judicial decisions of all of the various jurisdictions. The cases may differ; one court may take one view, another another. Hence we cannot consider these various decisions as the law in this state, but as interpretations of the common law, and we are at liberty to adopt that interpretation which seems to be the best." *In re Smith's Estate,* 55 Wyo. 181, 97 P.2d 677, 681 (1940).

The court of appeals in Arizona has also explained the relationship of the common law to the development of state law.

> "* * * The main characteristic of the common law is its dynamism. It does not remain static. The common law is not a thing of chiseled marble to be left unchanged for centuries.
>
> " 'Inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of stare decisis, which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose. If this were not so, we must succumb to a rule that a judge should let others "long dead and unaware of the problems of the age in which he lives, do his thinking for him." [Citation.]' " *Lewis v. Wolf,* 122 Ariz.App. 567, 596 P.2d 705, 706 (1979), citing *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105, 110 (1962).

relations. * * *" Black's Law Dictionary, p. 280 (5th ed. 1979).

The common-law rule that a wife was not entitled to damages for loss of consortium had its genesis in a social, economic and political climate entirely foreign to Wyoming in 1986. It would indeed be ironic if the "Equality State" continued to deny women the right to damages for loss of consortium, and at the same time allowed a man a cause of action for loss of consortium.

> "* * * A wife said the ancient precedents, could not sue because she was a legal nonentity. And, even if she could, she had no cause of action to assert because a servant has no 'right' to the services of her master. But none of this is true today, either as a matter of fact or as a matter of law. The Married Women's Acts and common constitutional provisions have wrought a revolutionary change. Legally, today the wife stands on a par with her husband. Factually, as we well know, her position is no less than that of an equal partner. The precedents of the older cases are not valid precedents. They are violative of women's statutory rights and constitutional safeguards. They are out of harmony with the conditions of modern society. They do violence to our convictions and our principles. We reject their applicability. The reasons for the old rule no longer obtaining, the rule falls with it. The obstacles to the wife's action were judge-invented and they are herewith judge-destroyed. * * *" *Montgomery v. Stephan*, 359 Mich. 33, 101 N.W.2d 227, 234 (1960), per Justice Talbot Smith.

We agree with the remarks of Justice Smith of the Michigan Supreme Court. In reading them we are reminded of the immortal words of the Great Sachem, smoke signal authority, who upon seeing the mushroom cloud at Yucca Flats on July 16, 1945, exclaimed, "Holy cow, I wish I had said that!"

The Restatement is in accord with *Montgomery v. Stephan*, supra:

> "Action by One Spouse for Harm Caused by Tort Against Other Spouse.
>
> "(1) One who by reason of his tortious conduct is liable to one spouse for illness or other bodily harm is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse, including impairment of capacity for sexual intercourse, and for reasonable expense incurred by the second spouse in providing medical treatment.
>
> "(2) Unless it is not possible to do so, the action for loss of society and services is required to be joined with the action for illness or bodily harm, and recovery for loss of society and services is allowed only if the two actions are so joined." Restatement (Second) of Torts § 693 (1977).

See also, *Hitaffer v. Argonne Co.*, 87 U.S. App.D.C. 57, 183 F.2d 811, 23 A.L.R.2d 1366 (D.C.Cir.1950), cert. denied 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed.2d 624, overruled on other grounds in *Smither & Co., Inc. v. Coles*, 1957, 100 U.S.App.D.C. 68, 242 F.2d 220, cert. denied 354 U.S. 914, 77 S.Ct. 1299, 1 L.Ed.2d 1429.

In accordance with the above principles, we overrule Bates v. Donnafield, supra, insofar as it denied a woman a cause of action for loss of consortium.

The trial court should have reduced the award to Marilynn Mitchell by the percentage of fault attributed her husband, Preston Mitchell. A cause of action for loss of consortium is a derivative action, and the causal negligence of the injured spouse limits recovery of the claiming spouse under the comparative negligence statute, § 1-1-109(b)(ii), W.S.1977. *Eggert v. Working*, Alaska, 599 P.2d 1389 (1979). Heft & Heft, Comparative Negligence Manual § 3.570 (1985).

## VI

We will reverse the punitive damages award. Punitive damages are not a favorite of the law and are to be allowed with caution within narrow limits. *Town of Jackson v. Shaw*, Wyo., 569 P.2d 1246 (1977). Since the purpose of punitive damages is not to compensate a plaintiff, but to punish a defendant and deter others, such damages are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime. Re-

statement (Second) of Torts § 908 Comment b (1979). The purpose of punitive damages is not to provide a windfall to plaintiffs and their attorneys, but is to publicly condemn some notorious action or inaction on the part of the defendant. *Sinclair Oil Corporation v. Columbia Casualty Company,* Wyo., 682 P.2d 975 (1984); and *Campen v. Stone,* Wyo., 635 P.2d 1121 (1981).

We have approved punitive damages in circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct.[4] Punitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence. *Danculovich v. Brown,* Wyo., 593 P.2d 187 (1979).

Although degrees of negligence are not considered in comparative negligence, it must be remembered that the traditional concept of gross negligence visualized less culpable conduct than willful and wanton conduct. Gross negligence has been defined as:

> "* * * Indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons maybe be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct. * * *" *Altman v. Aronson,* 231 Mass. 588, 121 N.E. 505, 506, 4 A.L.R. 1185 (1919).

Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another. *Danculovich v. Brown,* supra.

Appellees direct our attention to several policies and circumstances that they contend manifest willful and wanton misconduct on the part of appellant James S. Neiman that justified the punitive damages award. Appellees' argument with respect to some of these alleged derelictions manifests a measure of hyperbole. Appellees' principal focus is on the manner in which Neiman Sawmills secured the logs on their trucks during transit. The logs on the truck were secured by an overbind wrapped around them. The overbind was positioned about eight feet behind the front of the load. The overbind is a high tensile steel cable specially designed for hauling logs. The load is held in place, not only by the overbind, but also by side stakes on the trailer and by positioning the logs on the trailer in the grooves formed by the base logs.

■ As indicated in the factual recitation, a log became displaced and protruded to the right. This log struck Preston Mitchell, who was standing in his parked truck. Hindsight suggests that if an additional overbind had been positioned near the rear of the load, the offending log may not have become dislodged and the accident would have been avoided. We agree that appellants were negligent in not using multiple overbinds. There is no evidence, however, that their practice amounted to wanton and willful misconduct.

Mitchell testified that truck drivers he had worked with the last ten years general-

4. *Intentional Torts (e.g., assault or battery): Condict v. Condict,* Wyo., 664 P.2d 131 (1983); and *Petsch v. Florom,* Wyo., 538 P.2d 1011 (1975).
*Malicious Prosecution: Cates v. Eddy,* Wyo., 669 P.2d 912 (1983).
*False Arrest: Town of Jackson v. Shaw,* Wyo., 569 P.2d 1246 (1977).
*Trespass: Sears v. Summit, Inc.,* Wyo., 616 P.2d 765 (1980); and *Hall Oil Co. v. Barquin,* 33 Wyo. 92, 237 P. 255 (1925).
*Operating Motor Vehicle Under Influence of Drugs or Alcohol: Campen v. Stone,* Wyo., 635 P.2d 1121, 32 A.L.R. 4th 410 (1981).

ly used only one overbind. He further stated that he did not recall telling Mr. Neiman or any of the truck drivers that using one overbind was an unsafe practice. Mr. Neiman had used one overbind on his logging trucks since 1958, and before the present accident, the Neiman logging trucks had never had an accident arising from a log coming loose from the load. One of appellees' witnesses, a log hauler, testified that it was the policy of all the log haulers in the Hulett area, including Neiman Sawmills and himself, to use one overbind. The testimony regarding custom and history does not tend to negative negligence on the part of Neiman Sawmills or Virgil Weaver. However, this evidence tends to demonstrate that appellants' conduct was not wanton and willful. Significantly, most of the testimony in this regard came from appellees' witnesses.

The other evidence produced by appellees to demonstrate wanton and willful misconduct is even less convincing than the absence of a second overbind. There is no evidence that the alleged defective road repairs (cribbing) contributed to dislodging the offending log. The consequence of such deficiency is merely speculative. The lack of safety rules and regulations relate directly to the custom of using a single overbind, which we have already discussed. We do not see anything in the hiring and training of Virgil Weaver by Nieman Sawmills that suggests wanton and willful misconduct. Weaver was hired after he submitted a written application, and was interviewed regarding his experience as a logger. Additionally, another logging company gave Weaver a favorable recommendation. He was also required to pass a physical examination and procure a Wyoming Class A driver's license. Following training by two of Neiman's experienced drivers, Weaver was not allowed to drive alone until he was considered to be capable of handling the job as a log hauler and being accepted as a good driver. Mr. Neiman had been assured that Weaver could do the job and drive on his own.

The jury award of punitive damages against Virgil Weaver was $50. Because of this insignificant award we will not concern ourselves with this matter. De minimis non curat lex. We do not see anything that suggests wanton and willful misconduct on the part of Weaver, including the way he loaded his truck or the speed he was driving, or his lookout procedure and failure to heed a warning. Sometimes the line between conduct justifying punitive damages and less culpable conduct is indeed fine: *Sinclair Oil Corporation v. Columbia Casualty Company,* supra. Here, the conduct of appellant does not approach that fine line. Appellees presented a series of apparent negligent acts of omission and commission and, through skillful trial advocacy, parlayed them into a verdict for punitive damages.

The trial court should have directed a verdict in favor of appellants on the issue of punitive damages. We reverse the punitive damages award.

## VII

In their final issue appellants object to costs assessed by the court. In their cross appeal (case No. 84–195) Preston and Marilynn Mitchell complain that the court improperly disallowed part of the costs. We will dispose of the Mitchell cross appeal in connection with appellants' final issue.

Appellees filed a bill of costs covering six items:

| | | |
|---|---|---|
| 1. | Court and service fees | $ 96.96 |
| 2. | Travel expenses of plaintiffs' attorneys | 1,173.83 |
| 3. | Reporting fees | 1,635.68 |
| 4. | Photographs, visual aids, reports, supplies, etc. | 589.17 |
| 5. | Witness fees and mileage | 8,881.55 |
| 6. | Telephone and postage | 254.27 |
| | Total | $12,631.46 |

Appellants filed an objection to the bill of costs alleging that appellees were seeking recovery of expenses not authorized by statute, that the claimed costs were excessive, and that there was no evidence of the reasonableness or necessity of the claimed costs. Upon hearing, the trial court awarded appellees costs of $9,184.84, and on its own motion, also ordered appellants to pay

to the Clerk of the District Court jury services in the amount of $2,206.64.

The jury costs assessed against appellants payable to the county must be disallowed. The matter of costs is strictly statutory; costs were not allowed as a rule at common law. *Mader v. Stephenson*, Wyo., 481 P.2d 664 (1971).

Rule 38(b)(3), W.R.C.P., regarding jury fees provides:

"All demands for trial by jury shall be accompanied by a deposit of twelve dollars ($12.00). The jury fees in cases where jury trials are demanded shall be paid to the clerk of the court, and by him paid into the county treasury at the close of each week, and he shall tax as costs in each such case, and in all other cases in which a jury trial is had, a jury fee of twelve dollars ($12.00), to be recovered of the unsuccessful party, as other costs, and in case the party making such deposit is successful, he shall recover such deposit from the opposite party, as part of his costs in the case."

Rule 38(b)(3) is authority for appellees to recover the $12 jury fee from appellants, but does not authorize the assessment of costs against appellants for jury services.

This court held in *Johnson v. State*, Wyo., 532 P.2d 598 (1975), that the costs of prosecution do not include jury expenses of mileage and per diem. The rationale for our holding in that case and *Arnold v. State*, 76 Wyo. 445, 306 P.2d 368 (1957), regarding jury expenses is also applicable here. Furthermore, a court may not award costs to an entity which was not a party to the litigation. 20 Am.Jur.2d Costs § 26, p. 21 (1965); and 20 C.J.S. Costs § 107, p. 352, (1940).

The court awarded appellees costs for expert witness fees to two physicians, and expert witness fees for the services of a lawyer-economist. The statute allowing expert witness fees is § 1–14–102(b), W.S. 1977:

"In any civil or criminal case, any party may call expert witnesses to testify and if the court finds any witness to be a qualified expert and the expert gives expert testimony which is admitted as evidence in the case, the expert witness shall be allowed witness fees of twenty-five dollars ($25.00) per day or such other amount as the court allows according to the circumstances of the case. Expert witness fees may be charged as costs against any party or be apportioned among some or all parties in the discretion of the court."

In *Stevenson v. Henning*, Del.Supr., 268 A.2d 872 (1970), quoting with approval *State v. 0.0673 Acres of Land, etc.*, Del. Supr., 224 A.2d 598, 602 (1966), the Delaware Supreme Court stated:

"Witness fees allowed under § 8906 should be limited to time necessarily spent in attendance upon the court for the purpose of testifying. This does not include time spent in listening to other witnesses for 'orientation', or in consulting and advising with a party or counsel or other witnesses during the trial. * * * "[5]

The Delaware statute authorizing expert witness fees is not significantly different than Wyoming's statute, § 1–14–102, W.S. 1977.

The expert witness fees allowed as costs by the court in this case included time not necessarily spent in court attendance for purposes of testifying and should therefore be deleted. Furthermore, costs under the limitation that we have indicated should be supported by evidence of reasonableness. *Buttrey Food Stores Division v. Coulson*, Wyo., 620 P.2d 549, 20 A.L.R. 4th 549 (1980).

In the Mitchells' cross appeal, they contend that the trial court erred in disallowing part of their costs. The trial court disallowed $1,299.35 for discovery deposi-

5. 10 Del.C. § 8906 provides:
"The fees for witnesses testifying as experts or in the capacity of professional men in cases in the Superior Court, and the Court of Chancery, within this State, shall be fixed by the court in its discretion, and such fees so fixed shall be taxed as part of the costs in each case and shall be collected and paid as other witness fees are now collected and paid."

tions, $254.27 for telephone and postage, $589.17 for photographs, medical records, X-rays and visual aids, and $1,173.83 for mileage, motel and meals. These latter expenses were incurred by the Mitchells' attorney in taking depositions.

In *Roberts Construction Company v. Vondriska,* Wyo., 547 P.2d 1171, 1183 (1976), we quoted with approval *Wyoming Central Irr. Co. v. LaPorte,* 26 Wyo. 522, 188 P. 360, 362 (1920):

> "* * * [T]he matter of costs is purely statutory as costs were not allowed as a rule at common law. We of course have no statute which purports to authorize the charging of such a survey as is here involved, as an item of cost."

In the same case we also said: "* * * What constitutes proper costs in an action, to be assessed against the losing party, is not very clearly established by either statute or rule. * * *" Id., at 1182.

We recently considered the issue of whether the costs of discovery depositions are recoverable in *State v. Dieringer,* Wyo., 708 P.2d 1, 11–12 (1985), wherein we stated:

> "With respect to costs of discovery depositions, we espouse the rule that if the discovery deposition is reasonably necessary for the preparation of the case, then there is no abuse of discretion on the part of the district judge in awarding such costs. [Citations.] With respect to the exercise of discretion as to such costs, however, the burden must be upon the party seeking the award of costs to justify to the district court that those costs were reasonably necessary for the preparation of the case for trial. If the depositions are introduced at the trial, or are used for purposes of impeachment or refreshing the recollection of a witness at the trial that would ordinarily satisfy the burden of demonstrating that they were reasonably necessary. Other uses of the deposition in connection with the trial proceedings such as motions for summary judgment might serve to persuade the district court that the depositions were reasonably necessary, but it would not be required to so conclude. * * *" See also, *Duffy v. Brown,* Wyo., 708 P.2d 433 (1985).

The trial court properly disallowed the costs incurred by the Mitchells' attorney for mileage, per diem, telephone expenses, postage, photographs, medical records, x-rays and visual aids. *Kiefel v. Las Vegas Hacienda, Inc.,* 404 F.2d 1163, 12 A.L.R.Fed. 895 (7th Cir.1968), cert. denied 395 U.S. 908, 89 S.Ct. 1750, 23 L.Ed.2d 221, reh. denied 395 U.S. 987, 89 S.Ct. 2128, 23 L.Ed.2d 776 (1969); *Turner v. Willis,* 59 Hawaii 319, 582 P.2d 710 (1978); *Brown v. Citizens National Bank of Cheyenne,* Wyo., 269 P. 40 (1928); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2666 (1983); 20 C.J.S. Costs § 252 (1940). We hold that the cost of depositions introduced into evidence, or that are necessarily and reasonably used at trial to impeach testimony of adverse witnesses or to refresh the recollection of a witness, are proper expenses and may be assessed as costs.

In summary, we affirm the general verdict in favor of Preston Mitchell and the judgment in favor of Marilynn Mitchell for loss of consortium. However, both must be reduced by the percentage of fault attributed to Preston Mitchell (ten percent). Section 1–1–109(b)(ii), W.S.1977. We reverse that portion of the judgment awarding punitive damages to Preston Mitchell. The judgment granting costs is reversed in part, and affirmed in part, and remanded to the district court for a rehearing and entry of an order not inconsistent with this opinion.