UNION PACIFIC RAILROAD COMPANY, a Utah corporation, Appellant (Defendant),

v.

Loren J. RICHARDS, Appellee (Plaintiff).

No. 84–188.

Supreme Court of Wyoming.

July 9, 1985.

Henry F. Bailey, Jr., of Loomis, Lazear, Wilson & Pickett, Cheyenne, for appellant.

John E. Stanfield; John B. Scott; Michael Sue Kern of Smith, Stanfield & Scott, Laramie, for appellee.

Before THOMAS, C.J., and ROSE, ROONEY, BROWN and CARDINE, JJ.

ROSE, Justice.

### Nature of the Case

On March 30, 1982, the appellee, Loren J. Richards, suffered a crushing injury to the four fingers of his left hand while he was engaged in work for his employer, the Union Pacific Railroad Company. The four fingers were amputated, and subsequent operations became necessary in order to develop stubs so that the plaintiff might obtain some kind of limited finger utilization. These subsequent operations were partially successful, but the appellee was left with a badly deformed hand that is extremely limited in its usefulness and one which gives him continuous discomfort.

During the course of the proceedings, the railroad admitted liability, and the parties proceeded to trial on the issue of damages, with the jury returning a general verdict for the plaintiff-appellee in the amount of $425,000.

We will affirm.

### Questions Presented Upon Appeal

The appellant describes the questions for our consideration as follows:

"1. Whether, in the absence of proof of a probability of loss of future earnings, the Court erred in instructing the jury on that issue; and as a corollary question, whether the Court erred in allowing Plaintiff's economist, Dr. James Evenson, without a factual basis therefor, to testify regarding loss of future earnings or earning capacity.

"2. Whether, given the fact of no actual economic loss and no probability of economic loss in the future, the amount of the verdict awarded to Plaintiff was excessive in light of all the facts and circumstances of the case."

The issues with which we will concern ourselves here are:

1. Did the trial court commit error in instructing upon and permitting the jury to consider the issue of impairment of earning capacity?

2. Was the verdict excessive?

### ISSUE NO. 1

### Impairment of Earning Capacity (Loss of Future Earnings)

The trial court in this case permitted the jury to consider loss of future earnings as an element of damage. Subparagraph (d) of Instruction No. 9 is the only part of any instruction relevant to this issue against which objection was lodged, and it is here urged that subparagraph (d) permitted the jury to speculate as to whether or not plaintiff has suffered impairment of earning capacity.

We cannot agree with this contention of the appellant and will affirm the trial court on this issue.

Instruction No. 9 tells the jury members that, the defendant having admitted liability, they must

"* * * fix the amount of money which will reasonably and fairly compensate him *for those elements of damage* proved by the evidence to have been caused by the defendant * * *." (Emphasis added.)

The instruction then says:

"The *claimed* elements of damage are:

\* \* \* \* \* \*

"(d) Loss of earnings. The present cash value of earnings reasonably certain to be lost in the future, if any.

\* \* \* \* \* \*

"Whether any of these elements have been proved is for you to determine." (Emphasis added.)

### The Expert Testimony

In this case, the plaintiff called an economist, Dr. James A. Evenson, to aid in proof of damages. Before he testified, the jury was admonished that they could not consider the testimony of Dr. Evenson with regard to the *actual* loss of earnings, but only to the *possible loss of future earnings*. Based upon the economist's testimony and other evidence, the trial judge, in his memorandum in support of his order overruling the appellant's motion for a new trial, concluded that the jury was possessed of such evidence as would permit them, if they chose, to reach the following conclusions:

"(1) That the plaintiff's future employment with the Union Pacific Railroad Company was subject to termination upon any number of contingencies, including possible change of supervisors, change of employment policy by the board of directors, or his voluntarily seeking a new career and abandoning his present occupation;

"(2) That the plaintiff, after either an involuntary or voluntary termination of his employment with the Union Pacific Railroad Company would be impaired in his employability to certain specific percentages as compared with other male workmen of similar education, background and training who were not disabled by loss of four fingers on the left hand as plaintiff was and is; specific findings as to the present and past earnings of the defendant were available to the jury to be used as guides in the application, if they choose to make such findings, of the percentages set forth in the preceding finding numbered (2)."

■ We have carefully reviewed the law of impaired earning capacity and the record in the case at bar, and find that these conclusions of the trial judge are sound and accurate. We further find that this evidence is sufficient, together with the economist's explanation of the method utilized to reach his conclusions, to withstand appellant's charge that the court erred in instructing on the loss of future earnings.

The appellant argues that where the injury is shown to be permanent but there is no proof of actual loss of earnings, it is error to admit evidence of impaired earning capacity. We cannot agree. In this connection, the railroad argues that the trial court may not speculate about whether the appellant will lose his job with the Union Pacific Railroad Company thereby being forced to compete upon the open market for employment, and that the condition of the evidence is that so long as he works for the railroad he will not suffer impaired earning capacity.

■ Appellant's argument on this issue is not viable, because impairment of earning capacity does not depend upon proof of loss of earnings. In light of the appellant's contentions on this issue, attention is called to Annot., 18 A.L.R.3d 88, 99–100, where it is said:

"Since impairment of earning capacity does not depend on loss of earnings, it has been held that in order to recover for impairment of earning capacity in an action for personal injuries it is not necessary to show loss of earnings or the difference between earnings, if any, before and after injury. \* \* \*

"\* \* \* [P]roof that earnings increased or remained the same between the time of injury and the time of trial does not necessarily bar a recovery for impairment of earning capacity, since increased earnings may be quite compatible with impairment of earning capacity."

It was, thus, not necessary that plaintiff be able to prove that he had in fact lost earnings before testimony could properly be received to the effect that his earning capacity had been diminished. In fact, it is not necessary to the proof of diminished

earning capacity that an injured plaintiff show that he or she has *ever* competed in the workplace. We have held in *Fox v. Fox*, 75 Wyo. 390, 296 P.2d 252, 261 (1956), when considering a woman's right to recover under the married woman's statutes, that a person's impairment of her capacity to labor may be considered as an element of damage in an action for personal injuries

> " '* * * even though there is no proof that she ever had earned any money, or ever had done any work, and whether or not it appears that she had used her earnings in support of her family.' " Quoting from 41 C.J.S. Husband and Wife § 401(2)(c), p. 893.

This pronouncement represents the general rule of damage pertaining to recovery for impaired earning capacity, absent proof of actual loss of earnings, and it is just as applicable in the case at bar as it was in *Fox v. Fox*, supra. This is also the rule announced in 22 Am.Jur.2d, Damages § 92, where the text says that one element of damage for impairment of the plaintiff's earning ability is the decrease in his earning capacity. The encyclopedia goes on to say:

> "* * * This is a recovery for injury to the *capacity to earn* and not for the plaintiff's loss in earnings; thus, an unemployed plaintiff can be compensated for this element even though he can show no specific loss of earnings." (Emphasis added.)

Therefore, any contention which the appellant makes to the effect that the trial court erred in permitting the introduction of evidence upon the plaintiff's impaired earning capacity, absent proof of loss of earnings, does not find support in law. For further and more detailed authority see Annot., 18 A.L.R.3d 88, supra; 22 Am.Jur.2d, Damages § 89, pp. 130–132.

### Sufficiency of the Evidence On the Issue of Impaired Earning Capacity

In reaching his decision on a motion for new trial, the district judge quoted approvingly from Annot., 18 A.L.R.3d at 97:

> "* * * Although the evidence need not show conclusively or with absolute certainty that earning capacity has been impaired, mere conjecture or speculation does not warrant an award of damages therefor in personal injury actions. All damages, however, are subject to some uncertainties and contingencies, especially those that seek to compensate for future injuries. Accordingly, most courts hold that * * * impairment of earning capacity must be shown with reasonable certainty or reasonable probability, and there must be evidence which will permit the jury to arrive at a pecuniary value of the loss."

 Given this rule—with which we agree—it was sufficient for the economist to testify—as he did—that, in reaching a conclusion that appellee, who was possessed of a work and earnings history when he was injured, had suffered a 42.28 percent loss of earning capacity, he had considered the following factors:

(1) The time frame—i.e., when the injury occurs with reference to how long the subject has worked; when the injury takes place; the time of trial; and the plaintiff's life expectancy.

(2) The type of loss encountered.

(3) The plaintiff's actual earning capacity before injury.

(4) Earning capacity following injury— i.e., what would an individual with the plaintiff's injury, given his training and his physical, mental and educational capacity, be expected to earn on the competitive market in case of voluntary or involuntary discharge?

(5) Loss of fringe benefits.

In calculating anticipated diminished earning capacity following injury, the economist testified that, if the plaintiff were to remain with the Union Pacific Railroad Company, and was capable of doing his assigned tasks, he would suffer no diminished earning capacity.[1] He explained,

---

1. However, the expert testified:

> "In my experience I find a lot who will go back to work for their prior employer at sala-

however, that if the plaintiff were, for whatever reason, forced to compete for employment upon the open market, his earning capacity would be substantially diminished. In one example, the doctor testified to tables from the Public Health Service which showed that the employment rate for the nondisabled, married male, into which category the plaintiff fits, was, at the time he testified, 94.4 percent, while the employment figure for the same category of individuals with similar disabilities as those suffered by the appellee was 73.8 percent. He testified that there was 29.38 percent more unemployed disabled individuals in the plaintiff's work-age and educational category than those who were not disabled. Combining these figures, the expert expressed the opinion that the plaintiff had a 42.28 percent loss-of-earning capacity over his work-life expectancy.

The economist then calculated the income that plaintiff would receive from the Union Pacific Railroad Company in the work year of his injury to be $29,552, and testified that, assuming he were competing upon the open labor market, this annual income figure could be expected to be reduced by 42.28 percent to $17,057, resulting in an anticipated yearly loss of $12,495. The economist then reduced the yearly loss to present value, multiplied by the plaintiff's work-life expectancy, to reach the anticipated lost earning capacity figure of $290,928. Dr. Evenson then explained that the record revealed that the employee's fringe benefits cost the railroad 28.55 percent of the worker's salary, so that in order to arrive at a loss-of-fringe-benefits figure, all that need be done was to calculate 28.55 percent of the present-earnings loss. When reduced to present value, the witness arrived at a fringe-benefit loss of $82,914 for the plaintiff's work-life expectancy.

It was, then, the expert's opinion that, according to this method of calculation, the employee would suffer a wage and fringe-benefit loss of $373,842.

The witness described yet another approach which he designated as the "loss in interest approach," which assumed high interest rates and a low growth rate, explaining that most economists utilize this approach to reach a diminished-capacity fringe benefit reduced to present-value figure. Dr. Evenson explained that the utilization of this approach would indicate a diminished-capacity loss figure of $404,750 over the work-life expectancy of the plaintiff, and the fringe-benefit loss would be the same as in the prior example, giving a total loss of $520,104.

Based upon his testimony, inquiry and expertise, the witness was asked for his opinion as to the diminished earning capacity and fringe benefits, and expressed the judgment that the loss, reduced to present value over the work-life span of the appellee, would be between $450,000 and $500,000.

In view of the majority rule of law which holds that, in order to establish impairment of earning capacity, it is not necessary to prove loss of earnings, we hold that no error was committed in permitting the jury to hear the testimony of Dr. Evenson under the trial court's admonition, and we find that the controversial Instruction No. 9, subparagraph (d) was properly submitted.

### The Plaintiff's Testimony

In settling this issue, we are also mindful of the rule which holds that

"* * * the appearance of the plaintiff on the stand and his testimony as to the nature of his injuries and their duration are sufficient to take the question of impaired earning capacity to the jury in personal injury actions." Annot., 18 A.L. R.3d at 101, citing 22 Am.Jur.2d, Damages § 314.

In the trial of this case, the plaintiff testified, and the jury was shown his deformed hand and saw pictures of the hand

ries equal to or above what it was before, but when it gets tough they are one of the first people that are let go and they have more

underemployment. * * * A lot of times they also have problems with promotion."

after injury and operation. Mr. Richardson testified in detail concerning his training, his qualifications for other types of employment, his skills, employment obligations, the nature of his work with the Union Pacific Railroad Company, and the problems that his deformed hand presented in the course of his discharging his employment obligations. The jury also heard testimony concerning the emotional trauma that he had suffered and was suffering, as well as the plaintiff's testimony pertaining to his past and present pain and suffering. Supporting this testimony of the plaintiff was the testimony of a psychiatrist and an attending medical doctor. From this evidence, the jury could believe, if they chose, that the plaintiff had suffered substantial diminished earning capacity, and the plaintiff's testimony alone was sufficient to take this damage element to the jury for its consideration.

■ Given the testimony of the expert witness, the plaintiff and the doctors, we hold that there was sufficient evidence on the issue of diminished earning capacity for this element of damage to be submitted to the jury's consideration.

## ISSUE NO. 2

### Was the Verdict Excessive?

In view of our holding concerning Issue No. 1, we disregard the predicatory language found in appellant's identification of Issue No. 2, and address the simple question which asks:

"[Was] the amount of the verdict awarded to Plaintiff * * * excessive in light of all the facts and circumstances of the case"?

■ In responding to the charge that a jury's verdict is excessive, we are bound by these following guidelines. Before a jury verdict will be set aside, it must appear to be so excessive as to denote passion, prejudice, bias or some erroneous basis. *State Highway Commission v. Peters*, Wyo., 416 P.2d 390 (1966); *Fitzsimonds v. Cogswell*, Wyo., 405 P.2d 785 (1965); *Pan American*

*Petroleum Corporation v. Like*, Wyo., 381 P.2d 70 (1963).

Speaking to the excessiveness issue concerning a compensatory award in *Town of Jackson v. Shaw*, Wyo., 569 P.2d 1246, 1251–1252 (1977), we said:

"* * * Where law thus provides no specific measure for quantifying damages, the amount to be awarded rests almost totally within the discretion of the jury, and courts, both trial and appellate, are reluctant to interfere with that decision unless by its excessiveness or inadequacy the award carries with it an implication of passion, prejudice or bias or the result of some erroneous basis. 22 Am.Jur.2d (Damages) § 366, pp. 472–474; 35 C.J.S. False Imprisonment § 68, pp. 780–783. This is the standard for use generally in Wyoming, *Booth v. Hackney*, Wyo.1973, 516 P.2d 180; *Holly Sugar Corporation v. Perez*, Wyo.1973, 508 P.2d 595, and is the standard which we must here use. We cannot set aside an award of damages merely because we might consider it excessive; there must be more basis than that. *State Highway Commission v. Peters*, Wyo.1966, 416 P.2d 390.

"Of the various formulas used by different courts to determine the question of excessiveness, the frequently quoted and paraphrased standard employed by Chancellor Kent in a libel case answers the problem rather satisfactorily:

"'* * * The damages, therefore, must be so excessive as to strike mankind, at the first blush, as being beyond all measure unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess. * * *' *Coleman v. Southwick*, 1812, 9 Johnson 45, 6 Am.Dec. 253, 258."

■ We do not find such evidence in this record as would indicate that the verdict is so excessive as to show that the

minds of the jurors were poisoned by the passion, prejudice or bias of which the aforesaid opinions and authorities speak. Further, the appellant has not referred this court to such an "erroneous basis" as would lead us to the conclusion that such error influenced the jury. We are not aware of any such error in the case at bar as would lead to the conclusion that the jury verdict is anything but the well-reasoned work product of twelve intelligent and caring jurors.

Where passion and prejudice have not influenced the jury's verdict, the amount to be assessed for damages suffered by a personal-injury plaintiff is within the sound discretion of the trier of fact, *Fitzsimonds v. Cogswell*, supra. In the case at bar, the trial court, in resolving the motion-for-new-trial issues, considered very carefully the facts and law pertaining to the charge of excessive damages and found that such passion and prejudice as will upset a jury verdict as a matter of law did not exist. We find no abuse of the trial court's discretion in reaching this conclusion, and we find no lawful grounds for upsetting the jury's verdict in answer to the charge that it was excessive.

Affirmed.