Max COULTHARD, Appellant (Defendant),

v.

Garth COSSAIRT, Appellee (Plaintiff).

Garth COSSAIRT and Joe Finnerty, Appellants (Plaintiffs),

v.

Max COULTHARD, Appellee (Defendant).

Nos. 89-230, 89-231.

Supreme Court of Wyoming.

Dec. 14, 1990.

Rebecca A. Lewis (argued), and John J. Metzke of Hirst and Applegate, Cheyenne, for Coulthard.

John E. Stanfield (argued), and Bruce B. Waters of Smith, Stanfield & Scott, Laramie, for appellee Cossairt.

Before CARDINE, C.J.*, and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

CARDINE, Justice.

Appellant Max Coulthard appeals a $1.7 million award to appellee Garth Cossairt for injuries Cossairt sustained when Coulthard's vehicle went off a mountain road in Albany County. Cossairt, joined by another plaintiff in the original proceeding, raises an issue concerning the computation of costs on cross-appeal.

We affirm in all respects.

Coulthard phrases the issues in the following way:

"A. Did the trial court err in directing the verdict regarding liability against defendant/appellant Coulthard and not allowing the jury to make a determination regarding the comparative negligence of plaintiff/appellee Cossairt?

"B. Did the trial court err in denying defendant/appellant Coulthard's motion for new trial or amendment of judgment?

"C. Was the verdict excessive and a result of the influence of passion or prejudice?

"D. Was the verdict supported by sufficient evidence?"

On cross-appeal, Cossairt and Finnerty raise the following issue:

"[W]hether Wyoming should adopt a rule whereby the trial courts are allowed to review discovery activities and expenses and have the discretion to award discovery costs in appropriate cases."

## FACTS

On July 25, 1987, Coulthard, Cossairt, Kirk Schrawyer, Joe Finnerty, and Mike

* Chief Justice at time of oral argument.

Chesnut went to Mountain Home to celebrate Schrawyer's upcoming wedding with a bachelor party. They had decided to rent a cabin, celebrate and spend the night in order to avoid driving home following the planned drinking party. As one participant put it, "at the time that seemed like a great idea." It did not turn out that way.

The original plan called for all five men to ride from Laramie to Mountain Home in Chesnut's vehicle. Coulthard, however, also drove his truck for a reason not readily apparent from the record. Before leaving Laramie, they purchased beer and whiskey, which was kept in Coulthard's truck. On the way to Mountain Home, both vehicles stopped, and the men smoked marijuana and drank whiskey. Coulthard was also drinking while driving to Mountain Home.

Although they had no specific agenda for this party, they intended to stay at the cabin they had rented the entire time. After spending a little time at the cabin, Coulthard suggested they visit his uncle who lived across the highway. At his uncle's, Coulthard, who was the only one who brought fishing gear, suggested they go fishing. Coulthard's uncle recommended Pelton Creek as a good place to fish. They drove there in Coulthard's truck with Coulthard driving, Chestnut riding in the cab of the truck, and the other three riding in the back.

Coulthard had drunk at least eight cans of beer and half of a fifth of whiskey by the time they arrived at the fishing area. Instead of fishing all the time, Coulthard spent some time wrestling with Chesnut in piles of cattle droppings. When it came time to return to the cabin, no one, except for Coulthard himself, wanted Coulthard to drive because of his obvious intoxication. Cossairt got into the driver's side of the vehicle and told Coulthard that he should not drive. Coulthard was an all-state football player with a reputation for being tough. Cossairt was a quiet person whose interest in sports leaned toward cross-country running and skiing. Coulthard responded to Cossairt's suggestion by slapping Cossairt, pulling him from the driver's seat, and throwing him into the back of the truck. Acting threatening and loud, Coulthard declared, "I'm going to be the only one to drive that truck." The others felt intimidated enough by this to get into the truck as well. As with the trip to the fishing area, Chesnut rode in the cab of the truck, and the other three rode in the back.

From the moment Coulthard took off, his driving scared the three riding in the back of the truck. Driving at about 40 miles per hour on a curvy, washboarded gravel road, Coulthard caused the truck to fishtail and slide around the turns. Cossairt banged his hands on the roof and rear window of the cab and yelled in an attempt to get Coulthard to slow down. Schrawyer joined him in the banging and yelling when Coulthard did not respond to Cossairt's pleas.

After going through six or seven curves in this manner, the truck become airborne as it went off the road. Cossairt, Coulthard, Schrawyer and Finnerty were thrown from the truck.

Everyone was injured to some extent, with Cossairt sustaining the most serious injuries. Schrawyer, who attended to Cossairt and Finnerty after the accident, observed a gash in Cossairt's head and part of his calf missing. Cossairt was taken to Ivinson Memorial Hospital in Laramie, where it was feared he would not survive his injuries. He was then transported by helicopter to a Fort Collins, Colorado hospital. He remained hospitalized for 33 days, including five in intensive care.

Cossairt's injuries left him with permanent brain damage and physical disabilities. His skull was fractured and part of his brain was removed. He has difficulty with speaking and forming sentences. He has difficulty in using his right arm. His knee is unstable and susceptible to osteoarthritis. Academic testing following the accident places him in the bottom percentile for language and mathematic skills. In August 1988, he underwent cranioplasty surgery to repair his skull. He had additional knee surgery in May 1989.

Cossairt brought suit on November 12, 1987. Coulthard answered, admitting the accident and the injuries. He raised de-

fenses of contributory and comparative negligence. He claimed that his actions were not the proximate cause of the injury. He claimed that Cossairt's injuries resulted from a joint venture in which Cossairt participated with knowledge of the obvious and apparent danger. Cossairt's case was consolidated for trial with the cases of the three other passengers. Chesnut settled with Coulthard before trial. Schrawyer originally joined in the cross-appeal but was dismissed upon his own motion on February 9, 1990.

A five-day trial was held in July 1989. The three plaintiff's testified and offered evidence from other witnesses. At the close of the plaintiffs' case, Coulthard rested without presenting a defense. Upon the plaintiffs' motion, the court granted a directed verdict finding Coulthard negligent with no comparative negligence on the part of the plaintiffs. See W.R.C.P. 50(a). The case went to the jury on the question of damages, including whether punitive damages should be awarded. The jury awarded Cossairt $1.7 million, Finnerty $20,100 and Schrawyer $6,500. It found that punitive damages should be awarded and, following testimony by Coulthard on his financial status, awarded $500 in punitive damages.

Coulthard moved for a new trial or amendment of judgment in Cossairt's case. Coulthard claimed the $1.7 million award appeared to be the result of passion or prejudice on the part of the jury and not supported by sufficient evidence. See W.R.C.P. 59(a)(4) and (6). The court admitted it was surprised at the size of the award but recognized that the court's surprise is no basis to amend the judgment or grant a new trial. Finding the damage award to be supported by sufficient evidence and not the result of passion or prejudice, the court refused "to interfere with the collective wisdom" of the jurors and denied the motion. Coulthard does not contest the awards to Finnerty and Schrawyer.

In October 1989, the court awarded costs to the three plaintiffs. Cossairt requested $4,831.19, but the court disallowed some

expenditures for discovery and expert witness expenses, save for the time the experts spent testifying. The court awarded him $2,268.76 in costs. Finnerty requested $538.00 and was awarded $205.50. Schrawyer requested $548.42 and was awarded $70.00.

## DISCUSSION

### A. Directed Verdict

■ As a preliminary matter, we address Cossairt's contention that Coulthard failed to preserve the matters decided on directed verdict by not raising those issues on his motion for a new trial. While we continue to recognize the value of allowing the trial court to correct asserted errors of law through a motion for a new trial, such a motion is not necessary to preserve the issue of a directed verdict on appeal. *Cf. Harden v. Gregory Motors*, 697 P.2d 283 (Wyo.1985).

The rules in existence prior to the promulgation of the Wyoming Rules of Civil Procedure and Wyoming Rules of Appellate Procedure required a motion for a new trial be made before bringing an assignment of error before this court. *E.g. Schmidt v. First National Bank*, 29 Wyo. 260, 262, 212 P. 651, 652 (1923). However, a motion for a new trial was required as a condition for appeal only for grounds for which a new trial could be granted. *In re Austin's Estate*, 35 Wyo. 176, 181, 246 P. 459, 460 (1926).

The Wyoming Rules of Civil Procedure enumerate the grounds for which a court may grant a new trial. W.R.C.P. 59(a)(1) through (8). The enumerated ground relating most closely to a directed verdict is W.R.C.P. 59(a)(6), which concerns sufficiency of the evidence to support the verdict. The standard which must be met for granting a directed verdict is greater than that for granting a new trial. *Cody v. Atkins*, 658 P.2d 59, 64 (Wyo.1983). *See also* 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2806 (1973).

" 'When the evidence is wholly insufficient to support a verdict, it is the duty of the trial court to direct a verdict or

enter a judgment n.o.v., and the court has no discretion in that respect. But, the granting of a new trial involves an element of discretion which goes further than the mere sufficiency of the evidence. It embraces all the reasons which inhere in the integrity of the jury system itself.'" 658 P.2d at 64 (quoting *Tidewater Oil Co. v. Waller*, 302 F.2d 638, 643 (10th Cir.1962).

This higher standard eliminates the allegation of an erroneous grant of a directed verdict as a ground for motion for a new trial. To require that the issue be raised in a motion for a new trial would have no reasonable basis and would needlessly delay and prolong litigation. *See Crosslin v. Alsup*, 594 S.W.2d 379 (Tenn.1980). We will decide the issue of the directed verdict on its merits.

■■■■ In reviewing the grant of a directed verdict, we consider the evidence favorable to the party against whom the motion is directed, giving to it all reasonable inferences. *Carey v. Jackson*, 603 P.2d 868, 877 (Wyo.1979). A grant of a directed verdict is proper when, without weighing the evidence or considering the credibility of witnesses, the evidence is such that there is but one conclusion which reasonable jurors could reach. *Town of Jackson v. Shaw*, 569 P.2d 1246, 1250 (Wyo.1977). This court makes its determination without deference to the view of the trial court. *Danculovich v. Brown*, 593 P.2d 187, 190 (Wyo.1979). Since a directed verdict deprives the parties of a determination of the facts by a jury, such a motion should be cautiously and sparingly granted. *Cody*, 658 P.2d at 61.

■■■■ Coulthard contends that Cossairt was comparatively negligent, and the percentage of that negligence should have been submitted to the jury. The evidence he offers to support this contention is testimony that Cossairt had been drinking before the accident. The evidence is undisputed, however, that Coulthard refused to let anyone else drive his truck; he physically removed Cossairt from the driver's seat; struck Cossairt; and threw Cossairt in the back of the truck. No evidence shows that, of his own volition, Cossairt took that fateful ride. Even if we consider the testimony of Cossairt's drinking to amount to a scintilla of evidence to support Coulthard's contention, a scintilla is not enough. *Carey*, 603 P.2d at 877. The question is not whether there is no evidence supporting the party against whom the motion is directed, but rather whether there is evidence upon which the jury properly could find a verdict for that party. *Id.*

Our examination of the record reveals nothing that would allow the jury to find for Coulthard on the negligence issue. Coulthard directs us to nothing, save Cossairt's drinking. That evidence does not counter the conclusion that Cossairt, drunk or sober, was riding in the truck against his will. Appellant cross-examined some of the witnesses. He presented no evidence of his own. Whether Coulthard successfully attacked the credibility of any of those witnesses is a matter we do not consider, it being readily apparent that a reasonable jury could arrive at but one conclusion in this case. *Town of Jackson*, 569 P.2d at 1250. We hold, therefore, that the trial court properly granted a directed verdict on the question of negligence.

*B. Motion for New Trial*

■■■■ A trial court has broad discretion when ruling upon a motion for new trial, and we will not disturb its decision absent an abuse of discretion. *Medlock v. Merrick*, 786 P.2d 881, 883 (Wyo.1990). An abuse of discretion occurs when the court commits an error of law under the circumstances. *Waggoner v. General Motors Corp.*, 771 P.2d 1195, 1201 (Wyo.1989). Coulthard contends that a new trial was warranted because the verdict was so excessive as to be the result of prejudice or passion on the part of the jury, and it was not supported by the evidence.

■■■■ When applied to the action of a jury, "passion or prejudice" means "anger, resentment, hate, absence of reflection, disregard of the rights of others, and kindred motives." *Ries v. Cheyenne Cab & Transfer Co.*, 53 Wyo. 104, 79 P.2d 468, 474 (1938). We have further construed these

terms by stating "passion" means "moved by feelings or emotions, or may include sympathy as a moving influence without conscious violation of duty," and by stating "prejudice" to include "the forming of an opinion without due knowledge or examination." *Valdez v. Glenn*, 79 Wyo. 53, 330 P.2d 309, 312 (Wyo.1958).

The jury's determination of the amount of damages is inviolate absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, or other improper cause had invaded the trial. *Brittain v. Booth*, 601 P.2d 532, 536 (Wyo.1979). *See also Union Pacific Railroad Co. v. Richards*, 702 P.2d 1272, 1278 (Wyo.1985). The amount of damages " 'must be so excessive as to strike mankind, at the first blush, as being beyond all measure unreasonable and outrageous.' " *Town of Jackson*, 569 P.2d at 1252 (quoting *Coleman v. Southwick*, 9 Johnson 45, 6 Am.Dec. 253, 258 (1812)). This standard recognizes a range within which the verdict must fall and recognizes the judge, who has observed, tried, and compared numerous cases of this kind, as knowledgeable in determining a reasonable value of damages to be awarded. The substantial evidence test was considered by us, but we concluded it was too vague to be workable. What is substantial evidence to one judge may be not substantial to another. On the other hand, the test of when the judicial conscience is shocked is one which has been found workable for decades, and we continue to apply the test in this type of case.

Under this standard, we cannot conclude that passion or prejudice led the jury to award Cossairt $1.7 million in damages. The jury spent some six hours deliberating the verdict. As discussed below, Cossairt presented sufficient evidence to prove his damages, eliminating any contention of prejudice. We find no evidence that leads to a conclusion that passion influenced this award, and Coulthard points us to none. The record leads us to the conclusion that the verdict is nothing but "the well-reasoned work product of twelve intelligent and caring jurors." *Union Pacific Railroad Co.*, 702 P.2d at 1279.

When reviewing the sufficiency of the evidence to support a jury verdict, our approach is the opposite of that when we review the evidence to determine the propriety of a directed verdict. When determining whether a verdict is supported by the evidence, we assume the evidence in favor of the successful party to be true, leaving out of consideration entirely the evidence in conflict, and assigning every favorable inference to the evidence of the successful party that can be reasonably and fairly drawn from it. *Medlock*, 786 P.2d at 883.

Damages must be proven with a reasonable degree of certainty; however, proof of exact damages is not required. *Reposa v. Buhler*, 770 P.2d 235, 238 (Wyo. 1989). Cossairt met that burden. Cossairt claimed damages for past and future expenses for medical care and treatment; emotional and physical pain and suffering; disability or the inability to live with a normal body; loss of the enjoyment of life; loss of income; and loss of earning capacity. His proof included testimony from himself, other lay witnesses, and experts. The experts included medical doctors, a psychologist, a vocational rehabilitation expert, and an economist. Coulthard, in his brief, lists eight different areas which he contends are unsupported by the evidence. To support his argument, he asks us at the very least to characterize the evidence in a light most favorable to him. We cannot, and will not, view the evidence in that manner. Cossairt's life has been changed dramatically as a result of this accident. *Cf. Buttrey Food Stores Div. v. Coulson*, 620 P.2d 549, 555, 20 A.L.R.4th 419 (1980). The evidence is sufficient to support the verdict when viewed in the proper light.

## C. Award of Costs

Two of the plaintiffs below, Cossairt and Finnerty, center their cross-appeal on the assertion that the standards for awarding costs are unfair. They contend that the guidelines for recovery of expert witness

and discovery costs lead to inequities between litigants.

 The matter of costs is purely statutory. *Weaver v. Mitchell*, 715 P.2d 1361, 1373 (Wyo.1986). Two statutes are relevant to the award of the costs in this matter. Wyoming Statute 1–14–102(b) allows for the payment of expert witness fees and the charging of those costs against a party. That statute states:

"In any civil or criminal case, any party may call expert witnesses to testify and if the court finds any witness to be a qualified expert and the expert gives expert testimony which is admitted as evidence in the case, the expert witness shall be allowed witness fees of twenty-five dollars ($25.00) per day or such other amount as the court allows according to the circumstances of the case. Expert witness fees may be charged as costs against any party or be apportioned among some or all parties in the discretion of the court."

The phrase "such other amount as the court allows according to the circumstances of the case" gives the court discretion in determining the amount to award. *Stauffer Chemical Co. v. Curry*, 778 P.2d 1083, 1105 (Wyo.1989). This amount should be limited only to time spent actually testifying and should not include charges for pretrial conferences or time spent during trial while waiting to testify. *Hashimoto v. Marathon Pipe Line Co.*, 767 P.2d 158, 169 (Wyo.1989). Wyoming Statute 1–14–126 grants further discretion to the court in awarding and taxing costs. *See also* W.R. C.P. 54(d). Although we delineated some examples showing when awarding costs for discovery expenditures is warranted, *Weaver*, 715 P.2d at 1373, the court has discretion in making the award provided the expenditures are "reasonably required for trial preparation." *Hashimoto*, 767 P.2d at 169.

 Because the award of costs is within the discretion of the trial court, we will not disturb the court's decision in this matter absent a showing of an abuse of discretion. *Stauffer Chemical Co.*, 778 P.2d at 1105. Whether the court abused its discretion must be determined by the particular facts of the case. *England v. Simmons*, 728 P.2d 1137, 1140 (Wyo.1986) Cossairt and Finnerty contend the court awarded costs based on a somewhat mechanical application of the guidelines cited above. They fail, however, to cite the record to support the contention that such an application would amount to an abuse of discretion and establish that the discovery expenditures not awarded as costs were reasonably necessary. We have repeatedly cautioned litigants to comply with the record citation requirements of W.R.A.P. 5.01. *See, e.g., Jung–Leonczynska v. Steup*, 782 P.2d 578, 581 (Wyo.1989); *Condict v. Condict*, No. 89–51, Order dismissing appeal (Wyo., Jan. 24, 1990). Without support from the record, we are unable to find any abuse of discretion.

 The plaintiffs further argue that some litigants use discovery needlessly for the purpose of causing the opposition to spend so much money participating in the discovery process that the cost of litigation becomes prohibitively expensive. They urge adoption of a rule that would allow recovery for many discovery expenses to prevent this. The plaintiffs do not claim they were prejudiced by the amount of discovery conducted in preparation for this trial. Thus, to discuss this issue would amount to an advisory opinion which we ordinarily eschew. *Wyoming Health Services, Inc. v. Deatherage*, 773 P.2d 156, 158 (Wyo.1989). We deviate slightly from this rule, however, to note that abusive discovery tactics can and should be brought to the attention of the court which has the power to control discovery. W.R.C.P. 26(c). *See* 8 Wright & Miller, *Federal Practice and Procedure: Civil* § 2036 (1970). *See also* Pollack, *Discovery—Its Abuse and Correction*, 80 F.R.D. 219 (1979).

We find no error committed by the trial court in directing the verdict on the issue of Coulthard's negligence, in denying the new trial motion, and in awarding costs. This case is affirmed in all respects.

URBIGKIT, C.J., files a specially concurring opinion.

URBIGKIT, Chief Justice, specially concurring.

I concur, but write further in analysis that the proven injury in this case reasonably justified the damage award and we need not apply an extreme test for what was fairly and reasonably determined by jury verdict. Specifically, I question our continued lack of judicial responsibility in jury supervision encompassed within characterizations of "shock[ing] the judicial conscience", "an irresistible inference that passion, prejudice or other improper cause had invaded the trial[ ]" or "so excessive as to strike mankind, at the first blush, as being beyond all measure unreasonable or outrageous."[1] I suggest we abandon this language because a requirement that an award must "shock" an appellate jurist's conscience is no standard because it merely personalizes the appellate outcome. It is a test that exists without boundaries except those intrinsic to the mores of the trial judge or appellate court as decisional concepts of personal persuasion and political proclivity.

The intrinsic facts revealed within the recent course of Wyoming cases convince me that application of an asserted test of shock to the judicial conscience is a nonstandard in reality serving for a result oriented, unprincipled disposition by application of unboundaried decision. I have written before on this subject when the jury verdict itself was not justified on liability and apply equally the same concern as a test for either an excessive or insufficient damage award. See Medlock v. Merrick, 786 P.2d 881 (Wyo.1990), Urbigkit,

Justice, dissenting; Clarke v. Vandermeer, 740 P.2d 921 (Wyo.1987); and DeJulio v. Foster, 715 P.2d 182 (Wyo.1986).

Three cases serve for illustration. First is Brittain v. Booth, 601 P.2d 532 (Wyo. 1979), where the rule was used to justify the $10,000 award for personal injury after the incurrence of $7,800 in medical expenses. The result in that case was clearly not justice. My judicial conscience would have been then, and certainly is now, shocked at the resulting net of the $5,100 actual award where the injured person suffered a thirty-five to forty percent total disability. Brittain cannot then be related to the $425,000 award against the Union Pacific Railroad Company for injury damages where this court added a further criteria of justification of "erroneous basis" to the "passion, prejudice or bias" test. Union Pacific R. Co. v. Richards, 702 P.2d 1272, 1278–79 (Wyo.1985). Neither of these cases can be correlated to the reduction impressed by remitter against the successful plaintiff in Town of Jackson v. Shaw, 569 P.2d 1246 (Wyo.1977), where the rule was stated, but did not accord with the reduction made in verdict. If Town of Jackson was a reasonable appellate decision, there is certainly no semblance of the same test in reason and fairness for justice in either Brittain or Richards. Unnecessarily, extremity of language in criteria invites not only result oriented adjudication, but discriminatory and uncontrolled results.

In this accelerative society,[2] maintenance of the jury system requires vigilance so

---

**1.** Although phrased somewhat differently, the perception that is advanced by this approach was defined by the Minnesota appeal court in the analysis of an ATV injury case, Erickson By and Through Bunker v. American Honda Motor Co., 455 N.W.2d 74, 78 (Minn.App.1990):

> Second, Burnsville argues there is no competent evidence to support the damages for pain and disability and impairment of future earning capacity. The jury awarded $22,000 in damages for past pain and disability, $90,000 for future pain and disability, and $688,000 for loss of future earning capacity. The trial court found the verdict amounts were well within the potential dollar parameters for the facts of the case, and we agree. * * * A rehabilitation psychologist presented sever-

al professional career scenarios that he said could have been reasonably expected for Christopher based on his school records and his parents' educational achievements. There was sufficient evidence to support the damages for pain and disability and impairment of future earning capacity.

**2.** See the dialogue in Goldberg, Bridging the Gap, 76 A.B.A. J. 44, 46 (Sept.1990), where Roberta Ramo recognized:

> [T]he law itself has changed. Both the complexity of the law and the rate of change have so accelerated in the last decade that it is virtually impossible to teach the law. It is increasingly difficult to acquire and maintain competence in any area. If we don't under-

that relevance and rationality are retained. My persuasion remains constant that judicial action is required when the cognitive filters of the jury do not provide justice. *See Medlock,* 786 P.2d 881; *Clarke,* 740 P.2d 921; and *DeJulio,* 715 P.2d 182. We should apply a test of rationality to jury verdict supervision, not absolute unconditional acceptance except when particularized case features call for a rule disregard and result oriented decision. *See Cates v. Eddy,* 669 P.2d 912 (Wyo.1983).

It is my contention that we should substitute a rule of reason and recognition of properly exercised discretion for the post-event shock to the judicial conscience supervisory review applied test for jury verdicts. In assessment, we should recognize this separate function provided by the jury in evaluation of general damages and special damages as its deliberative requirement. Standards for review should exist identically whether emplaced by the trial court in answering motions for a new trial or judgments notwithstanding the verdict or by the appellate court in assessing the exercised discretion of the trial court for direct appellate review of a contended improper verdict.

Actual or special damages could be assessed in review under our traditional substantial evidence standard and general damages could be reviewed within the province of the jury to exercise discretion in alignment and allocation of the intangibles of hurt, pain and future loss. Review of actual damage awards are appropriate under the substantial evidence standard because such damages are calculable from the evidence available at trial. *See Boyd v. State,* 747 P.2d 1143 (Wyo.1987). The appropriate standard of review of the jury function could simply ask whether there was substantial evidence to justify the award.

Review of general damage awards are also appropriate under recognition of a discretionary determination because such damages are not subject to precise calculation and are designed to compensate the victim in full for *all* harm proximately

caused, which includes intangible damages. *Martinez v. City of Cheyenne,* 791 P.2d 949, 959 (Wyo.1990). The jury is asked to determine the appropriate damages and should be reversed only upon a clear showing of abuse of discretion. Because we have said "abuse of discretion has as its anchor point the query of 'whether the court [or jury] could reasonably conclude as it did,'" *Oien v. State,* 797 P.2d 544, 549 (Wyo.1990) (quoting *Noetzelmann v. State,* 721 P.2d 579, 583 (Wyo.1986)), our review could give deference to the decision of the fact finder where some evidence exists in the record for support. The dispositive question for our standard of review would ask if the jury could reasonably conclude as it did if all favorable inferences are accorded the position taken by the jury. This would be similar to the standard now used to review a directed verdict. *Cody v. Atkins,* 658 P.2d 59, 61 (Wyo.1983). I argue our use of the "shock [to] the judicial conscience" standard reflects an inadequate appreciation of the function we have asked the jury to perform and, in fact, has no relation to jury performance or appropriate judicial supervision.

The use of these proposed standards of review would streamline our review of appeals for motions for new trials or judgments notwithstanding the verdict when those motions are grounded on excessive or inadequate jury awards. *See Cody,* 658 P.2d at 63–64. Such standards of review would focus the appellate court's attention on the function of the trial court when ruling on these motions for new trial or judgments notwithstanding the verdict. We expect the trial court to defer to the fact finders when ruling on these motions for new trial or judgments notwithstanding the verdict. *See Medlock,* 786 P.2d at 883. Under the proposed standards, we could expect the trial court to also recognize the discretion utilized by the jury to estimate the harm to the plaintiff. From the vantage point of such additional deference, the trial court could determine that the size of an award was an abuse of the jury's discretion only if the award could not be reason-

stand that, then we're missing a fundamental change in practice.

ably justified by assuming "the evidence in favor of the successful party to be true, leaving out of consideration entirely the evidence in conflict, and assigning every favorable inference to the evidence of the successful party that can be reasonably and fairly drawn from it." *Crown Cork & Seal Co., Inc. v. Admiral Beverage Corp.,* 638 P.2d 1272, 1274 (Wyo.1982).

Review for the appellate court could then be the same standard used by the trial court in granting or denying the judgment notwithstanding the verdict or motion for new trial grounded on an excessive or inadequate verdict. The standards of review would be the same and easily identifiable by the appellate court—if the jury cannot be said to have abused its discretion in making its award, then a judgment notwithstanding the verdict or motion for new trial grounded on an excessive or inadequate verdict would be an abuse of discretion on the part of the trial court. *Lassiter v. International Union of Operating Engineers,* 349 So.2d 622 (Fla.1976). As well, if an appellate court could not say the verdict was an abuse of discretion after assuming " 'the evidence in favor of the successful party to be true, leaving out of consideration entirely the evidence in conflict, and assigning every favorable inference to the evidence of the successful party that can be reasonably and fairly drawn from it,' " *Seaton v. State of Wyo. Highway Com'n, Dist. No. 1,* 784 P.2d 197, 207 (Wyo.1989) (quoting *Reese v. Dow Chemical Co.,* 728 P.2d 1118, 1120 (Wyo.1986)), the jury verdict would stand undisturbed.

The Florida courts appear to have already begun moving in this direction.

Two factors unite to favor a very restricted review of an order denying a motion for new trial on ground of excessive verdict. The first of these is the deference due the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record. The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages.

*Lassiter,* 349 So.2d at 627. The court reviewed the trial court under its abuse of discretion standard.

The obsequiousness granted to the "shock the judicial conscience" standard of review for jury awards arose in *Coleman v. Southwick,* 6 American Decisions 253 (N.Y.1812). There the editor of the *New York Evening Post* sued the publisher of *The Albany Register* for libel. Following an award of $1,500 and a motion for a new trial, the defendant appealed. That court indicated: "The question of damages was within the proper and peculiar province of the jury. It rested in their *sound discretion,* under all the circumstances of the case * * *." *Id.* at 257 (emphasis added). Had the opinion ended there, today's standard of review might well be "abuse of discretion;" but the opinion added:

[A]nd unless the damages are so outrageous as to strike every one with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality or corruption, we cannot, consistently with the precedents, interfere with the verdict.

*Id.* at 257.

While shocks to my conscience as an appellate jurist usually come from reading "rights skeptical" judicial opinions[3] and

---

3. *See* Elfenbein, *The Myth of Conservatism as a Constitutional Philosophy,* 71 Iowa L.Rev. 401, 425–26 n. 124 (1986) (quoting Sager, *Rights Skepticism and Process–Based Responses,* 56 N.Y.U.L.Rev. 417, 441 (1981) and emphasis in original):

"The crucial operative aspect of rights skepticism is its attitude toward the resolution of [the] systemic tension [between majority rule and individual rights]. When a rights-supporting value of the Constitution is under-stood to be in arguable conflict with majority conduct, the rights skeptic insists that the case for the recognition of the right be made only under circumstances of textual, historical, or structural certainty; otherwise the majoritarian result must prevail. Under this conception, rights are narrowly defined exceptions to an otherwise prevailing general commitment to majority rule.

An hierarchical paradigm supports this lopsided view of rights and majority will. Rights

the corrosive effects of those opinions on traditional understandings of due process and equal protection, I cannot endorse such a personalized reaction to be appropriate for a standard of review.

We should recognize that in some cases what may be too much for a jury verdict, may in many other cases, by application of the same conscience shock rule, justify too little to be awarded. *Cf. Powers v. Johnson*, 562 So.2d 367 (Fla.App.1990) (citing *Butte v. Hughes*, 521 So.2d 280 (Fla.App. 1988)); *Thornburg v. Pursell*, 446 So.2d 713 (Fla.App.1984); and *Hernandez v. City of New York*, 156 A.D.2d 641, 549 N.Y.S.2d 139 (1989). *See also Tarin v. City Nat. Bank of Miami*, 557 So.2d 632 (Fla.App. 1990).

I am comfortable with a test of the appropriateness of judicial results embodied in reasonableness and need not encounter shock of my judicial conscience to find cause for exercise of supervisory responsibility to reject injustice. I reserve "shock [to] the judicial conscience" for deprivation of constitutional rights in general and lack of due process or equal protection in specific. Additur and remitter should not be dirty words in delivered justice to either the plaintiff or defendant. Of course in this case, passion was applied in the jury decision. Any thinking human being would be called into passionate evaluation of the liability facts and the extent of injury. That, however, is not the kind of humanistic concern for right and wrong here applied by the jury that could be characterized as either lacking reason or rejecting justification for applied justice.

The failure of judicial supervision of the American jury as a defense for the system

is not without comment and current academic consideration. See, for example, in particular within its many excellent articles, Daniels, *The Question of Jury Competence and the Politics of Civil Justice Reform: Symbols, Rhetoric, and Agenda–Building*, 52 Law & Contemp.Probs. 269 (1989). Equally impressive in analysis of the operation of the civil jury within an accelerated society and a complex social and economic system is the extensive analysis of Ansaldi, *Texaco, Pennzoil and the Revolt of the Masses: A Contracts Postmortem*, 27 Hous.L.Rev. 733, 840 (1990) (footnote omitted): [4]

> The jury verdict in the *Texaco* case, upheld on appeal under a highly deferential standard of review, is a classic case of "the wire snapping back"—a revolt of the masses not so much against the legal order as a whole as against an aberrant vision of legal obligation presented to them by a specialized subcommunity to which they did not belong, a model of justice and fair dealing having no basis in the mores of mass society. What does the case mean to lawyers and the legal system? Ultimately, it signals a serious threat to the place reserved for elite values in contract law.

Even a casual review of current cases reveals that the extreme protective envelope provided by this court by definition, if not necessarily by practice, is not generally followed in other jurisdictions. In recent case law, the state of Idaho has delineated in a series of decisions a modernized adaptation. *Sanchez v. Galey*, 112 Idaho 609, 733 P.2d 1234 (1986); *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986); *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979).[5]

skepticism places majoritarian virtues on a plane different from and higher than the rights component of our political tradition. Rights themselves are viewed in this model as deriving from a prior commitment to majority rule; rights exist *because* they have been endorsed by political majorities in the course of the proposal and ratification of the Constitution and its amendments."

**4.** An interesting comparison can be made between the substantively dissimilar yet logically comparable subjects of *Texaco* with the topic

found in Raveson, *Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power*, 65 Wash.L.Rev. 477 (1990).

**5.** It should be recognized that what shocked the public and consequently the legislature may not so easily shock the judicial conscience. Misinformation is the greatest cause of public misconception of the operation of the justice delivery system. However, realism, rationality and essential justice will ultimately, if not unilaterally, be defined and weighed by public perception for which the jury becomes the immediate ba-

Because many appellate issues are resolved under the abuse of discretion standard, we may well improve our supervision of the jury system and blunt the academic criticism occasioned by our traditional standard of review.[6] A current example will serve for illustration. Otis Mason, who died of leukemia in 1979, had been employed as an instructor at the Coast Guard Engineering School in Yorktown, Virginia. The Coast Guard purchased benzene for his use and others at the school which was a very commonly utilized industrial and commercial product well-known to amateur and professional mechanics. Mason filed suit against the supplier of the test kit containing the benzene and, following his death, his widow was substituted as plaintiff in the survival action. In the 1990 federal court decision, the jury awarded $4 million for his personal injuries, $5,025,000 for his survivor's wrongful death claim and punitive damages of $25 million.[7] The result shocked my conscience, but did not shock the trial judge who applied the *Coleman,* 6 American Decisions 253, ratio decidendi of 1812 to a 1990 economics problem of international competition. *Mason v. Texaco, Inc.,* 741 F.Supp. 1472 (D.Kan.1990); *Mason v. Texaco, Inc.,* 862 F.2d 242 (10th Cir.1988); *Mason v. Gerin Corp.,* 231 Kan. 718, 647 P.2d 1340 (1982).

We would simplify our review if we apply the principle of deference which is intrinsic to questions of abuse of discretion. *See Farber v. Massillon Bd. of Educ.,* 908 F.2d 65 (6th Cir.1990). Applying the standard of review that I argue should be adopted by the court, leads me to join the majority in affirming the award. The dimensions of reasonableness, discretion and deference which accompany the proposed standards of review provide ample space for my concurrence without resorting to "shock" or "irresistible inference [of] passion" which could be otherwise left to interpersonal relationships. The damage award to Mr. Cossairt in this case was substantial, but so was the damage caused to him—damage which is tragic and undoubtedly lifelong.

Again, my complaint is not with the majority looking for a traditional standard of review for jury awards and motions for new trials—my dissatisfaction is with what those traditional standards of review really are. I respectfully urge this court to look to the 1990's and not to incidental or accidental language of a by-gone era to enumerate a standard of review for jury awards and motions for new trials when the amount of damage awarded or not awarded is in question.

---

rometer. Public perception that some juries provide extreme results will inevitably adversely affect fair justice in later juries which are perceptive to community standards and reaction. The wire will snap back and injustice may tend to cultivate resulting injustice reactively and retroactively.

**6.** See generally Ansaldi, *supra,* 27 Hous.L.Rev. at 840; Daniels, *supra,* 52 Law & Contemp. Probs. 269; and Vidmar, *Foreword: Empirical* *Research and the Issue of Jury Competence,* 52 Law & Contemp.Probs. 1 (1989).

**7.** The jury award, which was approved by the presiding judge as punishment against the major American corporation for selling the government what it had ordered, was 0.31% of net worth and 1.92% of annual net earnings after taxes.