2008 WY 65

**Michael HANNIFAN and Kevin Hampleman, Appellants (Defendants),**

v.

**The AMERICAN NATIONAL BANK OF CHEYENNE, as Conservator of the Estate of Leslie Roy "Les" Butts, Davis And Dawson Butts, the minor children of Les Butts and Heather Butts, by their mother and natural guardian, Heather Butts, Appellees (Plaintiffs).**

No. S–07–0156.

Supreme Court of Wyoming.

June 11, 2008.

Representing Appellants: Joe M. Tieg and Paula A. Fleck of Holland & Hart, LLP, Jackson, Wyoming; and Patrick J. Murphy of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Murphy.

Representing Appellees: Michael D. Cok and Theodore R. Dunn of Cok, Wheat & Kinzler, PLLP, Bozeman, Montana; and James E. Fitzgerald of Fitzgerald Law Office, Cheyenne, Wyoming. Argument by Messrs. Cok and Fitzgerald.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellants, Michael Hannifan (Hannifan) and Kevin Hampleman (Hampleman) (collectively Appellants) contend that they are entitled to judgment as a matter of law [1] because there is insufficient evidence that either of them acted "intentionally" to harm the Appellees, Leslie Roy "Les" Butts (Butts), or Davis Butts and Dawson Butts, the minor children of Butts (hereafter "Children" or "Butts's Children"). Butts was severely injured and rendered a paraplegic when a large boulder landed on the piece of mining equipment (Terra–Gator) that he was operating at a Thunder Basin Coal Company mine near Gillette (Black Thunder Mine). The Butts Children seek damages for loss of consortium (the loss of the comfort, society, and companionship of their father). The American National Bank also appears in the caption as an Appellee, but only so because it is the conservator of the estate of Mr. Butts. It did not file a brief or otherwise appear in the proceedings before this Court. Heather Butts also appears in the caption, but her consortium claims were voluntarily dismissed before trial. Hannifan was the Safety Manager for Thunder Basin Coal Company, and Hampleman was the Mine Manager at Black Thunder Mine and the person charged with the overall operations of the mine on a day-to-day basis. It is Butts's contention in this case that they acted intentionally, by means of an intentional failure to act to guard his safety and, thus, brought about the circumstances that led to Butts's injuries.

[¶ 2] Hannifan and Hampleman also contend that the district court erred by giving inadequate, incomplete, and/or mistaken instructions on the elements of co-employee liability, and by its refusal to give the instructions they tendered to the trial court on the subject of co-employee liability. Furthermore, they contend that they are entitled to a new trial because Butts's trial counsel committed reversible error when he argued to the jury that if the jury attributed any fault to Thunder Basin Coal Company, then that would serve to diminish Butts's damages recovery.

[¶ 3] As additional background information, we note here that Thunder Basin Coal Company was not a party to this case (it was identified to the jury as a "nonparty"). However, Thunder Basin Coal Company was included in the jury verdict, and the jury was asked to assess the relative faults of Hampleman, Hannifan, and Thunder Basin Coal. Thunder Basin Coal's fault was determined under the ordinary negligence standard, whereas Hannifan's and Hampleman's respective faults were measured under the willful and wanton misconduct (intentional act) standard. The jury determined that Thunder Basin Coal Company's percentage of fault was 57%, Hampleman's was 25%, and

1. This contention was raised in a pretrial motion for summary judgment, in a W.R.C.P. 50 motion during trial, and in a post trial motion for new trial. The district court denied all three motions, and we will treat them as a single issue in this appeal.

Hannifan's was 18%. The jury also determined that Butts's damages were $18,000,000.00, and that each of the Children suffered damages in the amount of $2,000,000.00. After application of comparative negligence, the district court entered judgment in favor of Butts in the amount of $4,500,000.00 (with respect to Hampleman's negligence) and $3,240,000.00 (with respect to Hannifan's negligence). Furthermore, each of the Children received judgments in the amount of $860,000.00 ($500,000.00 with respect to Hampleman's negligence and $360,000.00 with respect to Hannifan's). We will affirm.

## ISSUES

[¶ 4] Hannifan and Hampleman raise these issues:

A. Since there was insufficient evidence presented at trial from which the jury could find that either [Hannifan or Hampleman] intentionally acted to cause physical harm or injury to [Butts], are [Hannifan and Hampleman] entitled to judgment as a matter of law?

B. If [Hannifan and Hampleman] are not entitled to judgment as a matter of law, are [they] entitled to a new trial because the trial court erroneously instructed the jury on the elements of co-employee liability, and refused [their] tendered co-employee liability instructions?

C. Are [Hannifan and Hampleman] entitled to a new trial because Butts's counsel informed the jury in closing argument that any fault it attributed to the non-party, Thunder Basin Coal Company, would diminish [Butts's] damages recovery?

Butts restates the issues like this:

1. Did the trial judge commit prejudicial error when under the facts of this case he instructed the jury on the issue of co-employee liability with the standard approved by this Court in *Bertagnolli v. Louderback* 67 P.3d 627 (2003)?

2. Did the trial judge abuse his discretion denying [Hannifan's and Hampleman's] post trial motions and ruling that the evi-

dence as presented by [Butts] met the standard set by this Court in *Bertagnolli?*

3. Did the trial judge abuse his discretion in denying [Hannifan's and Hampleman's] Motion for Mistrial based upon comments of [Butts's] counsel in closing argument which were consistent with the instructions of the [trial court] and non-prejudicial?

In their reply brief, Hannifan and Hampleman address a number of new issues which they claim arise from Butts's brief:

1. Whether or not Wyoming is an "intentional injury" state.

2. Whether *Mills v. Reynolds,* 837 P.2d 48 (Wyo.1992) (*Mills II*) prevents co-employee immunity for willful and wanton misconduct and, if so, whether *Mills II* should now be modified.

3. Whether the facts cited by [Butts] satisfy the statutory standard for co-employee liability.

4. Whether [Hannifan and Hampleman] properly preserved their objections to co-employee liability instructions given by the trial court.

5. Whether [Butts's] counsel's remarks in closing argument was harmless error because of the jury's ultimate allocation of fault.

6. Whether others at the mine had direct supervisory responsibility over Mr. Butts.

## THE STATUTE AND THE CASE LAW

[¶ 5] Appellants bring to their argument the complex history of Wyoming's statutory and judicial treatment of the very difficult issue of co-employee liability and the delicate constitutional "quid pro quo" that underlies worker's compensation benefits. See *Torres v. State ex rel. Division,* 2005 WY 7, ¶ 22, 105 P.3d 101, 112 (Wyo.2005). Indeed, it might be said that they attack it with a sledgehammer. That the history and evolution of co-employee liability is fraught with complexities and idiosyncrasies that are not readily parsed is a matter well-known to this Court. We do not intend to reiterate that history in this opinion. We are satisfied that we have set a workable standard for resolving such cases in our decision in *Bertagnolli v. Louderback,* 2003 WY 50, 67 P.3d 627 (Wyo.2003).

We decline the Appellants' ardent request to reverse our decision in that case. We also decline to engage in the debate as to whether or not Wyoming is an "intentional injury state," as that phrase is used in the general discussion of cases of this genre. These are complex questions, and not easily pigeonholed by a word or short phrase. The *Bertagnolli* case now serves as a complete restatement of Wyoming's jurisprudence in this regard. Also see Eric Hollowell, Annotation, *Willful, Wanton, or Reckless Conduct of Coemployee as Ground of Liability Despite Bar of Workers' Compensation Law,* 57 A.L.R.4th 888, § 3 (1987 and Supp.2007) (which confirms that Wyoming is far from being the "Lone Ranger," as characterized by Appellants).

[¶ 6] Wyo. Stat. Ann. § 27–14–104(a) (LexisNexis 2007) provides:

    (a) The rights and remedies provided in this act for an employee including any joint employee, and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and remedies against any employer and any joint employer making contributions required by this act, or their employees acting within the scope of their employment **unless the employees intentionally act to cause physical harm or injury to the injured employee,** but do not supersede any rights and remedies available to an employee and his dependents against any other person. [Emphasis added.]

[¶ 7] In *Bertagnolli,* ¶¶ 15–19, 67 P.3d at 632–34 (emphasis added), we explained:

    ... **We continue to believe the concept of willful and wanton misconduct has essentially the same legal effect as the statutory language "intentionally act to cause physical harm or injury."** Well before the 1993 amendment to § 27–14–104(a), this court expressly defined willful and wanton misconduct in terms of intentional actions:

        Willful and wanton misconduct is the *intentional* doing of an act, or an *intentional* failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have rea-

son to know that such conduct would, in a high degree of probability, result in harm to another.

*Weaver v. Mitchell,* 715 P.2d 1361, 1370 (Wyo.1986) (emphasis added); see *also Mayflower Restaurant Company v. Griego,* 741 P.2d 1106, 1115 (Wyo.1987). In addition, one of the bases of the *Mills* decision was the conclusion that allowing immunity for intentional acts and willful and wanton behavior violated the constitution, and the legislature's response to that decision was the adoption of the statute granting immunity except for intentional acts. *Mills,* 837 P.2d at 55. Our conclusion that the statutory grant of immunity covers all but intentional acts and willful and wanton misconduct is consistent with the parameters of statutory construction:

    "All statutes are presumed to be enacted by the legislature with full knowledge of the existing state of law with reference thereto and statutes are therefore to be construed in harmony with the existing law, and as a part of an overall and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to the decisions of the courts."

*Fosler v. Collins,* 13 P.3d 686, 689 (Wyo. 2000) (quoting *Voss v. Ralston,* 550 P.2d 481, 486 (Wyo.1976)); *see also Andersen,* 2002 WY 105, ¶ 22, 49 P.3d 1011, ¶ 22.

    Mr. Bertagnolli argues the key factors in finding co-employee liability under § 27–14–104(a) are a co-employee with (1) knowledge of the hazard or serious nature of the risk involved, (2) responsibility for the injured employee's safety and work conditions, and (3) willful disregard of the need to act despite the awareness of the high probability that serious injury or death may result. Our jurisprudence in this area is consistent with these factors. In *Calkins v. Boydston,* 796 P.2d 452 (Wyo.1990), we held the injured employee must demonstrate his co-employees had actual knowledge of the dangerous condition which caused his injury. Mr. Calkins worked for an oil well service company and

was injured when his leg got caught in the unguarded drive shaft of a pump truck. He sued the company secretary-treasurer, Marinell Boydston, and her son Gerald Boydston, the president of the company. The evidence demonstrated Mr. Calkins had used the pump truck in the past and had informed the Boydstons that the pump needed to be replaced. However, he provided no evidence the Boydstons knew the drive shaft was unguarded or the pump was dangerous; therefore, summary judgment was proper.

In *Smith v. Throckmartin*, 893 P.2d 712 (Wyo.1995), this court emphasized that the co-employee's actions must be willful and not merely inadvertent in nature. In that case, Mr. Throckmartin was Mr. Smith's supervisor, and, on the day of the accident, they were working together loading sand into a truck. Mr. Throckmartin operated a backhoe while Mr. Smith tamped and broke up clumps of sand in the truck bed with a metal bar. By Mr. Smith's own admission, Mr. Throckmartin hit the metal bar with the backhoe bucket by mistake causing Mr. Smith to fall from the truck bed and incur serious head and spinal injuries. This court again required the plaintiff to provide evidence the co-employee acted with a state of mind approaching intent to do harm or committed an act of an unreasonable character in disregard of known or obvious risks so great as to make it highly probable that harm would follow. 893 P.2d at 714. Inferences from evidence of violations of safety regulations were found insufficient to raise genuine issues of material fact regarding the co-employee's knowledge of the nature of the risks, particularly when uncontroverted evidence that the co-employee lacked such knowledge was presented. *See also McKennan v. Newman*, 902 P.2d 1285, 1287–88 (Wyo. 1995); *Poulos v. HPC, Inc.*, 765 P.2d 364, 366 (Wyo.1988).

In *Case v. Goss*, 776 P.2d 188 (Wyo. 1989), we reversed summary judgment in favor of certain co-employees, and the underlying facts are similar to those alleged by Mr. Bertagnolli. The plaintiff provided evidence that responsible supervisors were apprised of the dangerous condition, failed to take reasonable steps to remedy the dangerous condition, and overtly threatened to fire the reporting employee who was ultimately injured. While working at a coal mine, Mr. Case slipped on a hidden grease spot and fell onto the metal surface of the boom point sheave area of a dragline. We found evidence was provided that four co-employees had varying degrees of direct supervisory responsibility for Mr. Case's safety and working conditions, had been made aware of the dangerous condition, had refused to clean or allow Mr. Case to clean or lock out the area to lessen the danger posed, and had threatened to terminate his employment if he did not do the work as instructed.

In each of these cases, we consistently held the requirements of the statute and the standards of willful and wanton misconduct were met when the evidence demonstrated the co-employee had knowledge of the dangerous condition and demonstrated a disregard of the risks through intentional acts. With this standard in mind, we now must review the evidence submitted by Mr. Bertagnolli to determine whether it was sufficient to create a genuine issue of material fact with regard to the supervisors' knowledge of the dangerous condition and whether they acted intentionally in disregard of known risks.

## DISCUSSION

[¶ 8] Our discussion must begin with Butts's essential contention that the Appellants' liability is premised on the array of hazardous conditions that were extant on the day Butts was injured, and the information available to the Appellants regarding those conditions at the time they decided to continue mining, without correcting any of the hazards.

### Sufficiency of the Evidence

[¶ 9] We give great deference to a jury verdict:

In reviewing a sufficiency-of-the-evidence question, we assume the evidence in favor of the successful party to be true, leaving out of consideration entire-

ly the evidence in conflict, and assigning every favorable inference to the evidence of the successful party that can be reasonably and fairly drawn from it. *City of Rock Springs v. Police Protection Ass'n,* Wyo., 610 P.2d 975 (1980); *Brittain v. Booth,* Wyo., 601 P.2d 532 (1979). In addition, when reviewing a jury verdict, we leave to the jury the duty of ascertaining the facts, reconciling conflict therein and drawing its own inferences if more than one inference is permissible. *Neal v. Wailes,* Wyo., 346 P.2d 132, 134 (1959). Also, when the facts permit the drawing of more than one inference, then it is for the jury to choose which one will be utilized and, if supported by substantial evidence, the jury's choice will be held by us to be conclusive. *Berta v. Ford,* Wyo., 469 P.2d 12, 15 (1970); *Ford Motor Company v. Arguello,* Wyo., 382 P.2d 886 (1963).

*Crown Cork & Seal Co., Inc. v. Admiral Beverage Corp.,* 638 P.2d 1272, 1274–75 (Wyo.1982). Further:

> Juries generally have great discretion in determining the amount of damages to be awarded. *John Q. Hammons Inc. [v. Poletis],* 954 P.2d [1353] at 1358 [ (Wyo. 1998) ]; see also *Union Pacific Railroad Company v. Richards,* 702 P.2d 1272, 1278 (Wyo.1985). We are reluctant to interfere with a jury's verdict on damages "unless the award, by its excessiveness or inadequacy, denotes passion, prejudice, bias or some erroneous basis." *John Q. Hammons Inc.,* 954 P.2d at 1358. See also *Union Pacific Railroad Company,* 702 P.2d at 1278.

*Francis v. Pountney,* 972 P.2d 143, 146 (Wyo.1999).

*Knowles v. Corkill,* 2002 WY 119, ¶ 21, 51 P.3d 859, 865–66 (Wyo.2002).

■ [¶ 10] With this standard of review in mind, we proceed to set out below only those facts which we are permitted to take into account in deciding this issue in this case. At the outset, we note that many demonstrative exhibits, especially photographs, were used by the parties. We are unable to include those photographs in this opinion, and our only comment on them will be that they likely had a significant impact on the jury's decision-making process. The old saying is that a picture is worth a thousand words, and that is the case with some of the photographs in the record on appeal. In some cases, perspective on the size of the hole in which the mining takes place is emphasized by the contrast between people, pickups, pieces of large machinery, and the "high wall" and benches of the strip mine. We will also note here that throughout the testimony at trial, and in the briefs, frequent mention is made of the Mine Safety and Health Administration (MSHA) and its role in circumstances such as those presented here.

[¶ 11] On January 22, 2002, Mr. Butts was employed by the Thunder Basin Coal Company as a utility man at the Black Thunder Mine. He and a fellow employee were in an area of the mine known as the "East–West Boxcut." That area of the mine was unique because it had "high walls" on both sides, and the catch benches were in the coal rather than in the overburden. Some employees referred to that area as the "valley of death" or "coffin box" because of the potential dangers it held for mine employees. Butts and his workmate were laying out electrical cable to be used by one of the coal shovels the next day. That fellow employee saw no apparent signs of danger for Butts, but admitted that the catch benches were ineffective because they were full of rubble. Catch benches are designed to catch rubble such as that which sloughed off and injured Butts. Butts's part in the mining process was to operate a piece of equipment called a Terra–Gator. While he was doing that job, a rock fell from the south high wall and landed on top of the Terra–Gator, which was in the middle of the open pit. However, that fellow employee did not actually see the rock strike the Terra–Gator because his back was turned to Butts at that moment. However, he testified that he had not before seen a rock come out into the middle of the boxcut. Due to his injuries, Butts had no memory of the day of the accident, or the events that occurred during the two days before the accident. Thus, events of those days could only be told

by other employees who were present, and there is a paucity of that. Because of the narrowness of the boxcut area, traffic was confined to only the middle of the boxcut (so as to avoid being hit by falling debris). Butts was doing his work in that area, so no traffic could pass by him until he completed his work. The only eyewitness was a truck driver who was required to stop until Butts was clear of the middle of the road.

[¶ 12] Butts's theory of this case was that the rock that landed on the Terra–Gator came down from the south high wall, rolled off the debris-filled catch benches, traveled down the face of the coal high wall, bounced to a height of 20 to 30 feet, and launched into the middle of the open pit onto the top of the Terra–Gator. The eyewitness to the accident, Brian Kivi, testified that he saw: "... the high wall came down and hit the Terra-Gator." Kivi conceded that his recollection of that day's events was not especially good. However, based on Kivi's testimony, as well as expert testimony, the Appellants' theory was that this was an extremely unusual event in that a large piece of debris "shot out" of the high wall and into the middle of the pit, about 53 feet out into the pit from the wall, without ever hitting any of the catch benches. The official report made on the day of the accident indicated that the pit "was scary early in the morning," other crews had said they would not operate the shovel in that area, "there were a couple of sloughs during the day some rocks hit the rubber tires of the Terra–Gator (it was in the middle of the boxcut at that time), earlier sloughs sent rocks into [the] middle of the pit and blocked truck traffic (had to be pushed out of the way so trucks could [be driven on the narrow roadway])." The supervisor that day was not aware of any of these things, although he testified that he made rounds through that area five times during that day and found or heard nothing unusual.

[¶ 13] Dan Dowdy related an incident involving an earlier "slough" (a mass of material that sloughed from the side of a mine working hole) that occurred at a different location on the high wall in August or September of 2001. The principal purpose of his testimony was to disclose that he had personally spoken with both Hannifan and Hampleman about the dangers of the high wall immediately after his brush with death when that "slough" occurred.

[¶ 14] Hannifan testified that he was the Safety Manager at the Black Thunder Mine. The first goal of his work was to identify dangers. The second goal was to eliminate identified dangers, if possible. If the danger cannot be eliminated, then the next step was to guard or protect against the danger. He admitted that he anticipated problems with all high walls, and that they are extremely dangerous at times. He also conceded that the catch benches were full and, thus, not effective in guarding against the danger of sloughs such as that which injured Butts, other than that they would tend to slow material headed down into the pit. Hannifan conceded that state-of-the art FOPS (Falling Objects Protection System) would have been effective to protect Mr. Butts.

[¶ 15] Hannifan's testimony became problematic because another witness, Tom Skinner, a safety advisor for pit operations at Thunder Basin Coal, testified that the Terra-Gator used by Butts was required to have FOPS in place, and that it did have FOPS in place. However, as it turned out, he was wrong about that, and later testimony established that it did not have FOPS in place. Hannifan disagreed with Skinner that FOPS was required on the Terra–Gator, and characterized the Mine Safety Regulations as "open to interpretation" in that regard. An important part of Hannifan's job was to enforce the Ground Control Plan (Revised: October 15, 2001). Examination of that document revealed that the East–West Boxcut was narrower than the Control Plan required (it was 135–140 feet but should have been 160–400 feet). In addition, the "high walls" were 75 degrees steep, rather than 70 degrees steep. Hannifan also conceded that the full benches might have the effect of projecting rubble out to the center of the boxcut. Hannifan contended that the catch benches did not look like "ski jumps" (as characterized by Butts's counsel), but described them as having a 35 degree slope (the angle of repose common to all materials). There was also a discrepancy with re-

spect to the width of the catch benches built into the coal (they were 20, rather than 30, feet wide), and that no catch benches had been put into the high wall, although one or two such benches could have been put into it. On January 21, 2002, the day before the disabling event, Marty Martens, Hannifan's safety adviser, told Hannifan that he was concerned about that area of the pit—because the high wall was unstable and the catch benches were full. He warned Hannifan that he was concerned about utility people, such as Butts, working on the ground under the high wall. Although Martens had the authority to close down the area, he did not. Instead, both Hannifan and Hampleman went and visually inspected the high walls on the day before the accident that injured Butts and ascertained that there was no reason to close down mining operations. In addition to Martens's warning to Hannifan, there had been freezing and thawing temperatures immediately preceding the slough that injured Butts, and such freezing and thawing temperatures add to the danger of sloughs occurring.

[¶ 16] Hannifan's testimony also revealed that MSHA had noted problems with the high walls three times in 2001, before Mr. Dowdy was hurt in the much larger slough described previously. Hannifan also testified that although the Dowdy incident could have been a fatality, no additional precautions were taken. Indeed, Hannifan was not aware that there was mining going on in the area where Butts was injured until the day before Butts was injured. During January of 2001, all the miners were required to take a refresher safety course from MSHA, and Hannifan made a spot decision to ask participants to make comments on any safety problems that they were concerned about. Many of those comments were directed at the safety problems with the high walls in the boxcut where Butts was injured.

[¶ 17] Hannifan's credibility was severely tested because of his testimony about whether or not he had directed an employee to shred many of the written comments received from participants in the training classes, after Butts was injured. At first, he said he did not, and then said he could not

remember, and then finally admitted that he had. As Hannifan's testimony wound down, he conceded that the boxcut was dangerous and that it was an unsafe working condition. Furthermore, he conceded that he was the person legally responsible for safety at the mine. Although Hannifan at first denied that there were rocks out in the center area of the pit other than the one that hit Butts and the Terra–Gator, after reviewing photographs taken that day, he had to admit that there were many other rocks out in the area of the Terra–Gator.

[¶ 18] Bob Moore was a safety advisor at the mine and worked for Mr. Hannifan. Moore disagreed with Hannifan, in that Hannifan testified that the safety people only advised higher management. Moore thought they needed to take a more active role in assuring the day-to-day safety of employees. He participated with Hannifan in the safety refresher course in January of 2001, and recited substantially the same information as Hannifan did with respect to the safety concerns expressed by the participants—i.e., the high wall conditions. At the time Dan Dowdy was involved in the "slough" of August or September of 1991, Dowdy asked Moore if he had authority to shut down the mine. Moore said he did not, and he also believed that Hannifan did not have that authority, that they were just advisors to higher management, i.e., Mr. Hampleman.

[¶ 19] Kevin Hampleman testified that he was the mine manager at the Thunder Basin Mine and that he had general overall responsibility for running the mine. He noted that the mine went through a change in operational management just before Mr. Butts's injuries occurred. Prior to that time, Michael O'Keif was in charge of operations, and after his retirement in mid-January of 2002, Hampleman was in charge. However, there were other managers with the same level of authority as Hampleman, including Mike Hannifan, the safety manager. During this transition period, Hampleman was out in the field (i.e., pits, areas being stripped, etc.) 75% of the time, as were many other supervisors. One of the purposes of this field time was to monitor the high walls. Hampleman testified that MSHA did not cite him or the mine

for its failure to have installed FOPS on the Terra–Gator, although MSHA has authority to issue a citation to any individual working in a mine. After the incident wherein Mr. Butts was injured, the citation issued was only to Thunder Basin Coal. Hampleman never saw the comments collected by Hannifan during the safety refresher course, described more fully above. Hampleman agreed that Marty Martens came to him on January 21, 2002, the day before Butts's accident, and expressed concern about the high wall in that particular area. He and Hannifan went out and looked at it and thought it looked okay. The spot where they parked, and from which they made their observations, was near where Butts was injured. Also, at about the same time that they were making their observations, blasting in another area of the mine "rattled the pit pretty good," but it did not appear to disturb the high wall. Thus, a decision was made to continue operations. Hampleman was not directly supervising Butts the day of the accident. Under cross-examination, Hampleman also agreed that if the rock that hit the Terra–Gator had come straight out of the wall, and come down at a 45 degree angle, and hit the Terra–Gator, without ever hitting any catch bench, then the fact that the catch benches were full would not have had any affect on the event.

[¶ 20] Ben Seegmiller is a mining engineer who testified on behalf of the Appellants. He is one of 10–20 persons who specialize in his particular area of study, high wall stability and rock mechanics for mining operations. His direct testimony can best be summarized by simply saying that it was his opinion that Thunder Basin Coal had done everything in a manner consistent with the standards usually applied in such mining and that the methodology used was safe, economic, and practical. He also testified that conditions such as those prevailing at the Thunder Basin Mine on the day of Butts's accident are the sorts of conditions that lead to large sloughs. He also testified that catch benches are designed to retard sloughs but that even if the catch benches are full and no longer functioning as "catch" benches, they still tend to retard the movement of material so that it ends up at the "toe" (essentially at the bottom very near the wall, but not out into the middle of the pit). His opinions included the observations that visually monitoring the high walls is one of the "best possible" methods to protect workers from sloughs of high walls. Also monitoring devices of various sorts are used (but none apparently were in this instance). He also testified that "to walk out and see some small place and say, well that's going to fail, there's just simply no way to do it." Seegmiller also testified that he used a program to explain how that one rock managed to get out to the middle of the pit and land on the top of the Terra–Gator occupied by Butts. It is called the "sturzstrom failure phenomenon." It was developed by a Swiss scientist in the 1880's to explain a landslide that killed hundreds of people in the Swiss village of Elm.

> And his conclusion, and the thinking—up until the mid 1970's, the thinking was the way you would get rocks to move way out where you couldn't explain them by any other way, was that the rocks would come down and envelop air and contain air inside of them, and the rocks would sit on this cushion of air, and they would flow out. Air doesn't have much friction to it, and they would simply flow on that cushion of air. It was the only thing people could understand that could allow an explanation for these slope failures that would go out so far.

Continuing, Seegmiller explained, that the theory got debunked in the 1970's,

> ... [s]o they had to come up with a new hypothesis, and what they hypothesized since then, it's very difficult to understand. I'm not even sure I understand it myself. But when the rocks begin to fail, they agitate and kinetic energy is created in there by the rocks bouncing off one another. The failure begins and develops and rocks can come shooting out from that.

For Seegmiller, Brian Kivi's testimony "absolutely confirms" that this incident was a sturzstrom event. Seegmiller based this upon Kivi's "testifying under oath." We are compelled to note here that, when read in its entirety, Kivi used various words to describe the incident and, most importantly, did not

really remember it very well at all. Seegmiller knew of no other case where such an event had happened in mining. A hard-nosed cross-examination undermined much of Seegmiller's testimony, including that he did not see Kivi's deposition in its videotaped format where pictures and pointing to pictures were an important part of that material. He only read the transcript of it.

[¶ 21] Rodney King was called as a witness for the Mine, and his direct testimony favored its position. However, on cross examination he conceded that he had personal knowledge of many events of sloughing off the high wall that damaged equipment, including a rock going through the window of a pickup that was parked 160 feet from the high wall.

[¶ 22] We have carefully reviewed all of the evidence in the record, and we conclude that the evidence was sufficient so that the jury could conclude as it did. The conglomeration of circumstances that led to Butts's injuries included the fact that the high walls soared to 272 feet. Such walls are inherently dangerous in and of themselves, but these were too steep and not in compliance with the ground control plan adopted for the mine. The boxcut where Butts was working was the only place in the mine with high walls on both sides. The boxcut was the only place in the mine with coal benches but not catch benches. The boxcut was too narrow and not in compliance with the ground control plan. The slough incident involving employee Dowdy gave an early warning of nascent problems with the high walls, but nothing different was done to address those problems. The coal benches, that were not wide enough to be effective, were rendered even more ineffective because they were full of debris forming what was described as the minimum "angle of repose." The benches tended to direct material out into the center of the pit. Freezing and thawing temperatures added to the potential for instability in the high walls. The day before the injurious event, an experienced supervisor told Hannifan and Hampleman of dangers in the boxcut. Finally, the Terra–Gator did not have FOPS, the last line of defense for Butts and a requirement under MSHA regulations. Furthermore, we conclude from our careful review of the record that, although neither Hannifan nor Hampleman were directly supervising Butts at the time he was injured, both had direct supervisory authority for Butts's safety and working conditions the day he was injured.

### The Jury Instructions

[¶ 23] The applicable standard of review is well-known:

> When examining the propriety of jury instructions, this Court reviews whether the instructions, taken as a whole, adequately and clearly advise the jury of the applicable law. The trial court is not obligated to give an instruction offered by a party as long as the jury is adequately instructed on the law as it pertains to that case. The trial court's ruling on an instruction will not constitute reversible error absent a showing of prejudice, and prejudice will not be said to result unless it is demonstrated that the instruction confused or misled the jury with respect to the proper principles of law. *Sellers v. Dooley Oil Transport*, 2001 WY 44, ¶ 9, 22 P.3d 307, 309 (Wyo.2001); *Cervelli v. Graves*, 661 P.2d 1032, 1036 (Wyo.1983). The burden is on the appellant to show prejudicial error. *Daley v. Wenzel*, 2001 WY 80, ¶ 29, 30 P.3d 547, 554–55 (Wyo. 2001).

*Parrish v. Groathouse Const., Inc.*, 2006 WY 33, ¶ 7, 130 P.3d 502, 505 (Wyo.2006).

[¶ 24] Among others, the district court gave this instruction:

### JURY INSTRUCTION NO. 6

The parties stipulate that a "state of the art" FOPS (falling object protective structure) would have been effective in preventing injury to Les Butts.

[¶ 25] In Instruction Number 7, the trial court instructed the jury about all benefits Butts had received, as well as all benefits he might anticipate receiving during his lifetime, from the Worker's Compensation Division. That instruction also informed the jury that if Butts won a judgment in this case, then he would have to repay the Division all moneys

paid to him, up to the amount of the Division's lien, but not to exceed 1/3 of the total amount of his recovery. Jury Instruction Number 8 informed the jury that it was their duty to follow the instructions given by the trial court.

[¶ 26] In Instruction Number 10, the district court stated:

In this action, the plaintiffs [Butts and Children] have asserted that Defendant Kevin Hampleman caused physical harm or injury to Les Butts. The plaintiffs have the burden of proving by a preponderance of the evidence the following:

(1) That Defendant Hampleman acted with willful and wanton misconduct; and (2) that Defendant Hampleman's willful and wanton misconduct caused the injuries and damages claimed to have been suffered by Les Butts in the amount claimed.

[¶ 27] In Instruction Number 11 the district court stated:

In this action, the plaintiffs [Butts and Children] have asserted that Defendant Michael Hannifan caused physical harm or injury to Les Butts. The plaintiffs have the burden of proving by a preponderance of the evidence the following:

(1) That Defendant Hannifan acted with willful and wanton misconduct; and (2) that Defendant Hannifan's willful and wanton misconduct caused the injuries and damages claimed to have been suffered by Les Butts in the amount claimed.

[¶ 28] Instruction Number 14 informed the jury:

In your deliberations, you should consider the following definitions:

**A.  Ordinary Negligence.**

Ordinary negligence is the failure to use ordinary care. Ordinary care means the degree of care which should reasonably be expected of the ordinary careful person under the same or similar circumstances. The law does not say how such an ordinary careful person would act. That is for you to decide.

**B.  Willful and Wanton Misconduct.**

Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another.

[¶ 29] Jury Instructions Number 16 and 17 told the jury:

The United States Code of Federal Regulations states: "Mobile equipment; falling object protective structures (FOPS). When necessary to protect the operator of the equipment, all self propelled tractors, with or without attachments, that are used in surface coal mines shall be provided with substantial falling object protective structures (FOPS)."

Violation of a regulation is evidence of negligence. If you determine that a party or a nonparty violated a regulation and that the violation played a substantial part in bringing about the injury or damage, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not the party or nonparty was at fault at the time of the occurrence.

[¶ 30] Jury Instruction Number 18 stated:

Thunder Basin Coal Company has a duty to provide its employees, including Mr. Butts, with a reasonably safe work place and safe equipment.

[¶ 31] Jury Instruction Number 19 provided:

In order for Plaintiffs to prevail on their claim against Defendant Hampleman, Plaintiffs must demonstrate that said defendant had direct supervisory responsibility for Les Butts['] safety and working conditions on the day of the accident.

Similarly, in order for Plaintiffs to prevail on their claim against Defendant Hannifan, Plaintiffs must demonstrate that said defendant had direct supervisory responsibility for Les Butts['] safety and working conditions on the day of the accident.

A general duty to supervise and maintain a safe workplace does not constitute direct supervisory responsibility.

[¶ 32] Jury Instruction Number 24 provided:

An injury or damage is caused by an act, or a failure to act, whenever it appears from the evidence that the act or omission played a substantial part in bringing about the injury or damage.

[¶ 33] Hampleman and Hannifan contend that these instructions failed to fully apprise the jury of the applicable law. However, when the instructions given by the district court are compared with those proposed by the Appellants, but rejected by the district court, it is clear that the rejected instructions essentially duplicated the legal concepts contained in the instructions as given. The following instructions were offered by Appellants and rejected by the district court:

## PROPOSED JURY INSTRUCTION NO. 2

### CO–EMPLOYEE LIABILITY

A co-employee is not liable for injuries to another co-employee unless the employee intentionally acts to cause physical harm or injury to the injured employee.

## PROPOSED JURY INSTRUCTION NO. 3

### BURDEN OF PROOF—DEFENDANT HANNIFAN

In this action, the plaintiffs have asserted that Defendant Michael Hannifan intentionally acted to cause physical harm or injury to Les Butts. The plaintiffs have the burden of proving by a preponderance of the evidence the following:

(1) That Michael Hannifan acted intentionally to cause physical harm or injury to Les Butts; and (2) that Michael Hannifan's intentional conduct caused the injuries and damages claimed to have been suffered by Les Butts in the amount claimed.

In determining whether any fact in issue has been proved by a preponderance of the evidence in this case, you should, unless otherwise instructed, consider the testimony of all of the witnesses, regardless of whether the plaintiffs or the defendants called them, and all of the exhibits received in evidence, regardless of who produced them.

## PROPOSED JURY INSTRUCTION NO. 4

### BURDEN OF PROOF—DEFENDANT HAMPLEMAN

In this action the plaintiffs have asserted that Defendant Kevin Hampleman intentionally acted to cause physical harm or injury to Les Butts. The plaintiffs have the burden of proving by a preponderance of the evidence the following:

(1) That Kevin Hampleman acted intentionally to cause physical harm or injury to Les Butts; and (2) that Kevin Hampleman's intentional conduct caused the injuries and damages claimed to have been suffered by Les Butts in the amount claimed.

In determining whether any fact in issue has been proved by a preponderance of the evidence in this case, you should, unless otherwise instructed, consider the testimony of all of the witnesses, regardless of whether the plaintiffs or the defendants called them, and all of the exhibits received into evidence, regardless of who produced them.

## PROPOSED JURY INSTRUCTION NO. 5

### INTENTIONAL CONDUCT—DEFINED

"Intentional conduct" by a co-employee requires that the co-employee had: (1) actual knowledge of the hazard or serious nature of the risk involved; (2) direct responsibility for the injured employee's safety and work conditions; and (3) willful disregard of the need to act despite the awareness of the high probability that serious injury or death may result. To intentionally act to cause physical harm or injury means to act with willful and wanton misconduct toward that employee. Willful and wanton misconduct is defined and described for you in Instruction No. 7.

## PROPOSED JURY INSTRUCTION NO. 7

### DISTINCTION BETWEEN ORDINARY NEGLIGENCE AND WILLFUL AND WANTON MISCONDUCT

The phrase "willful and wanton misconduct" has the same legal effect as the phrase "intentionally act to cause physical harm or injury." The aggravating factor which distinguishes willful and wanton misconduct from ordinary negligence is the actor's state of mind. Thus, in order to prove that an actor has engaged in willful and wanton misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm. In other words, in order to prove that Michael Hannifan or Kevin Hampleman engaged in willful and wanton misconduct, Plaintiffs must demonstrate that they acted with a state of mind that approached intent to harm Les Butts.

▆▆▆ [¶ 34] When the rejected instructions are compared, side-by-side, with the instructions given, it is obvious that the primary difference between the two, lies in the rejected instructions' emphasis on the statutory language "acted intentionally to cause physical harm or injury." However, as set forth in *Bertagnolli*, that language has the same legal effect as "willful and wanton misconduct" and, therefore, it was not necessary for the district court to include the statutory language together with a discussion of willful and wanton misconduct. Instruction Nos. 10 and 11 made it clear that the Appellees had to prove, by a preponderance of the evidence, that the Appellants acted with willful and wanton misconduct. These instructions made Proposed Instruction No. 2 unnecessary. Also, while the Appellants' Proposed Instruction Nos. 3 and 4 correctly stated the law, they were not necessary to "adequately and clearly advise the jury of the applicable law" because Instruction Nos. 9 and 10 covered the same concepts. Proposed Instruction No. 7 explains that willful and wanton misconduct has the same legal effect as "intentionally act to cause physical harm or injury" and then instructs that a state of mind approaching intent to do harm must be found to constitute willful and wanton misconduct, citing to *Poulos v. HPC, Inc.*, 765 P.2d 364, 366 (Wyo.1988). The concept of state of mind comes into that case through a citation to *Hamilton v. Swigart Coal Mine*, 59 Wyo. 485, 143 P.2d 203, 206, 149 A.L.R. 998 (Wyo.1943). Again, while Proposed Instruction No. 7 may be a correct statement of the law, a proper definition of willful and wanton misconduct was provided to the jury through Instruction No. 14, and the additional language regarding state of mind was not essential. Finally, Proposed Instruction No. 5 set forth the three-part test for willful and wanton misconduct in the co-employee context as summarized in *Bertagnolli*. While that instruction may have been a clearer statement of the law, the definition of willful and wanton misconduct set forth in Instruction No. 14 contained the concept of knowledge of the circumstances as well as high probability of harm (items 1 and 3 of the test). And Instruction No. 19 required the jury to find that the Appellants had direct supervisory responsibility for Mr. Butts's safety and working conditions (item 2 of the test). Consequently, we cannot conclude that by failing to give Proposed Instruction No. 7, the district court failed to "adequately and clearly advise the jury of the applicable law." [2]

---

2. A more simple and direct approach to the instructions could have been more helpful to the jury in considering these complex issues. We would suggest that district courts and litigants in the future consider one instruction such as:

A co-employee is liable to another co-employee if the employee acts intentionally to cause physical harm or injury. To act intentionally to cause physical injury is to act with willful and wanton misconduct. Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, in a high degree of probability, result in harm to another. In the context of co-employee liability, willful and wanton misconduct requires the co-employee to have 1) actual knowledge of the hazard or serious nature of the risk involved; 2) direct responsibility for the injured employee's safety and work conditions; and 3) willful disregard of the need to act despite the awareness of the high probability that serious injury or death may result.

[¶ 35] We have carefully examined the instructions that the district court gave to the jury, in light of the instructions offered by the Appellants, and we conclude that the instructions given adequately conveyed to the jury this Court's interpretation of § 27–14–104(a) as it is set out in the *Bertagnolli* case, and that those instructions served to properly guide the jury's decision-making process in this particular case.

**Refusal of Motion for Mistrial and Demand for New Trial**

[¶ 36] With respect to mistrial we have held:

"The court's ruling on a motion for mistrial ... is reviewed for an abuse of discretion." *Espinoza v. State*, 969 P.2d 542, 546 (Wyo.1998), cert. denied, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 52 (1999); see also *Ross v. State*, 930 P.2d 965, 968 (Wyo. 1996). " 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' " *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998) (quoting *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986)); see also *Stroup v. Oedekoven*, 995 P.2d 125, 128 (Wyo.1999).

In determining whether there has been an abuse of discretion, we focus on the "reasonableness of the choice made by the trial court." *Vaughn*, 962 P.2d 149, 151 (Wyo.1998). If the trial court could reasonably conclude as it did and the ruling is one based on sound judgment with regard to what is right under the circumstances, it will not be disturbed absent a showing that some facet of the ruling is arbitrary or capricious.

*Jordan v. Brackin*, 992 P.2d 1096, 1098 (Wyo.1999).

*Terry v. Sweeney*, 10 P.3d 554, 557 (Wyo. 2000).

[¶ 37] The Appellants based their motion for new trial on the same set of facts and circumstances as they did their motion for mistrial. Trial courts have broad discretion when ruling on a motion for new trial,

and they will not be reversed absent an abuse of that discretion. *Pauley v. Newman*, 2004 WY 76, ¶ 17, 92 P.3d 819, 825 (Wyo.2004).

[¶ 38] The jury was given this instruction:

### JURY INSTRUCTION No. 15

The Plaintiffs' claims must be determined on the basis of comparative fault. In deciding the case you will need to know the meaning of the term "fault." A party is at fault when that party's conduct (or misconduct) meets the required legal standard and is a cause of the injury or damages for which the claim is made. The relevant required legal standards are explained in other instructions.

There is no claim that Les Butts was at fault.

It will be necessary for you to determine the percentage of fault, if any, of the Defendant Hannifan, Defendant Hampleman and Thunder Basin Coal Company.

Defendant Hannifan is at fault only if his actions, or inaction, constituted willful and wanton misconduct.

Defendant Hampleman is at fault only if his actions, or inaction, constituted willful and wanton misconduct.

With regard to Defendants Hannifan and Hampleman the percentage of fault you assign to them, if any, must be that only attributable to willful and wanton misconduct and not to ordinary negligence. Should you find that either the Defendant Hannifan or the Defendant Hampleman are at fault for any measure of ordinary negligence, then that percentage of ordinary negligence must be added to the percentage of fault of Thunder Basin Coal Company, if any.

Thunder Basin Coal Company is at fault if its actions (or inactions) constituted ordinary negligence.

In order for fault to be attributed to the Defendant Hannifan, the Defendant Hampleman, or Thunder Basin Coal Company, such fault must have been a cause of injury to Les Butts.

It also will be necessary for you to determine the amount of damages, if any, sustained by the plaintiffs. You are to determine the amount of damages, if any, without regard to how you answer any other questions on the verdict form.

Each defendant's liability for damages is limited to the percentage of fault, if any, that you find is attributable to that defendant.

In explaining the consequences of your verdict, the court has not meant to imply that any defendant is at fault. That is for you to decide in conformity with these instructions.

[¶ 39]  Appellants point to our holding in *Haderlie v. Sondgeroth*, 866 P.2d 703, 716 (Wyo.1993) as having a direct effect on this case. There, we said with respect to comparative negligence:

The jury is to be informed of the consequences of its determination of the plaintiff's percentage of fault, defendant's and other actors' percentages of fault, only in the context of explaining that the court will reduce the amount of damages by the percentage of fault attributed to the plaintiff and that each defendant is liable only for the proportion of total damages determined by the percentage of fault attributed to that defendant. Informing the jury of those consequences is all that the phrase encompasses. In cases in which the jury will determine percentage of negligence of several persons, some parties and some not, care should be exercised to assure that the jury is not left with the impression that plaintiff has, has not, or will not recover from persons not parties to the case before them. This is in accord with W.R.E. 408. If a better public policy would be to inform the jury of more concerning settling defendants, then that ought to be accomplished by amendment to the Wyoming Rules of Evidence or by legislative enactment.

This issue arises because Butts's counsel made this argument during closing:

And now today you've heard that Black Thunder Coal Company is on the verdict form. They're going to ask you to attrib-
ute the fault to Black Thunder Coal Company.

Mr. Hampleman, when I asked him if he contended anyone was at fault, Mr. O'Keif or somebody else responsible, he said maybe. And then I showed him his contention interrogatory, and we read it. And he gave sworn testimony during this case before he got to court. This question was asked: Do you contend the injuries suffered by Les Butts were the fault of some person or entity other than yourself?

And he read his answer. Defendant Hampleman contends that the injuries suffered by Les Butts were the result of a natural event occurring during the mining process. Combination of the nature of the overburden, weather, and random timing in the release of rock and dirt falling in [the] location Mr. Butts happened to be traveling.

And I didn't ask—show interrogatory of Mr. Hannifan because he didn't blame the mine. But now their lawyers will ask you to attribute fault to the mine in this case.

The mine is not a defendant. People in the mine were doing what they were asked to be doing. They were driving around in pickups and watching the wall. These are the folks with direct supervisory responsibility for the safety.

I'll tell you why they'll ask you to do that. It's in Instruction 15, where it says: Each defendant's liability for damages is limited to the percentage of fault, if any, that you find attributable to that defendant. So if you attribute fault to the mine, it takes away from any recovery Mr. Butts—

[¶ 40]  Counsel for Appellants interposed an objection at this point. A discussion followed, during which the district court agreed that Butts's attorney had run afoul of the district court's liminal orders, although Butts's attorney contended that it was fair argument under Instruction No. 15. Appellants' counsel contended, "that cat is out of the bag, it really can't be put back in," and asked the trial court to grant a mistrial. The district court offered to give a limiting instruction, but that was refused by the Appellants because it "would draw more attention"

to the irremediable damage that already had been done. Appellants, thus, took an all or nothing approach to this issue, i.e., the only possible remedy, for the asserted error, was for the trial court to declare a mistrial and reset the matter for a new trial. The district court took the Appellants' motion for mistrial under advisement and reserved ruling on it until after the jury had reached a verdict. In significant part because the jury attributed 57% of the fault to the mine, the district court determined that the motion for mistrial should be denied, as should the motion for new trial.

[¶ 41] We have carefully examined these matters in light of the applicable standards of review and the pertinent portions of the record on appeal. We conclude that the district court did not abuse its discretion in denying the motion for mistrial, nor did it abuse its discretion in denying the motion for new trial.

## CONCLUSION

[¶ 42] Appellants are not entitled to judgment as a matter of law in light of this Court's decision in *Bertagnolli*, which we shall continue to apply in cases such as the instant one. The evidence was sufficient to sustain the jury's conclusion that the Appellants acted with willful and wanton, intentional negligence. The instructions given by the district court adequately instructed the jury on the law applicable to this case. Appellants are not entitled to a mistrial nor are they entitled to a new trial. The Judgment of the district court is affirmed.

VOIGT, Chief Justice, specially concurring.

[¶ 43] The doctrine of *stare decisis* requires us to follow *Bertagnolli v. Louderback*, 2003 WY 50, 67 P.3d 627 (Wyo.2003). At the same time, I am not convinced that we have not written into Wyo. Stat. Ann. § 27-14-104(a) (LexisNexis 2007) an exception to immunity that was not intended by the legislature in that we are blurring the distinction between "intentional" and "willful and wanton." The statutory phrase at issue is "unless the employees *intentionally act to cause* physical harm or injury to the injured employee." (Emphasis added.) It appears

to me that the word "intentionally" applies both to the word "act" and to the word "cause." If that was not the legislature's intent, the phrase would read "unless the employees *intentionally act and cause* physical harm or injury to the injured employee." The words "act to cause" suggest a specific intent that harm follow. The definition of "willful and wanton misconduct" quoted from *Bertagnolli* in ¶ 7 of the majority opinion, contemplates an intent to act, but not an intent to harm.